**AIDS ACTION COMMITTEE OF MASSACHUSETTS, INC.,**
Plaintiff, Appellee,

v.

**MASSACHUSETTS BAY TRANSPOR-TATION AUTHORITY, et al., De-fendants, Appellants.**

No. 94–1116.

United States Court of Appeals,
First Circuit.

Heard Oct. 7, 1994.

Decided Nov. 9, 1994.

James G. Reardon, with whom Margaret R. Suuberg, Julie E. Reardon, Francis J. Duggan, and Reardon & Reardon, were on brief, for appellants.

H. Reed Witherby, with whom Smith, Duggan & Johnson, Sarah R. Wunsch and

Massachusetts Civil Liberties Union Foundation, were on brief, for appellee.

Before BOUDIN, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

BOWNES, Senior Circuit Judge.

In this appeal, we must decide whether defendant-appellant Massachusetts Bay Transportation Authority (MBTA) acted constitutionally in declining to run in its subway and trolley cars seven public service advertisements composed by plaintiff-appellee AIDS Action Committee of Massachusetts, Inc. (AAC). The ads promote the use of condoms to help stop the spread of the virus which causes AIDS, the Human Immunodeficiency Virus ("HIV"). The district court ruled that the MBTA's actions contravened the First Amendment, and issued an injunction which, *inter alia*, ordered the MBTA to run the AAC ads. *See AIDS Action Committee of Mass., Inc. v. Massachusetts Bay Transp. Auth.*, 849 F.Supp. 79 (D.Mass.1993). For reasons different than those relied upon by the district court, we agree that the MBTA's actions violated the First Amendment. We therefore affirm.

*I.*

AAC is a Massachusetts not-for-profit corporation which includes among its main purposes AIDS education of the general public, individuals at high risk of HIV infection, and health care professionals. The MBTA is a political subdivision of the Commonwealth of Massachusetts. It is explicitly authorized to "sell, lease or otherwise contract for advertising in or on the facilities of the authority." *See* Mass.Gen.L. ch. 161A, §§ 2 and 3 (1993). Through its advertising agent, Park Transit Displays, Inc. ("PTD"), which was a defendant below but is not a party to this appeal, the MBTA regularly authorizes the posting of commercial and public service advertisements in the spaces above its car windows and doors. The MBTA, in conjunction with PTD, has accepted and continues to accept public service advertisements on a wide variety of topics.

In July 1992, AAC submitted seven proposed public service advertisements ("the 1992 AAC ads") to the MBTA and requested that they be run in September 1992. Each of the proposed ads had a large color picture of a condom wrapped in a package, and a message stating that latex condoms are an effective means of preventing the transmission of HIV. The ads also included headlines and copy which, to varying degrees, involved the use of sexual innuendo and double entendre. In August 1992, the MBTA told AAC that it was rejecting three of the seven ads. In September 1992, the MBTA changed its mind, and informed AAC that it would run the three previously-rejected ads in October 1992 at no cost to AAC. The MBTA had run the other four ads in September 1992. The seven 1992 AAC ads are reproduced as Exhibit A in the Appendix.

The 1992 AAC ad campaign precipitated a significant number of telephone calls and letters to the MBTA. The MBTA submitted to the district court thirty-seven letters and summaries of telephone calls as a sample of this reaction. One of the MBTA's submissions reflects a rider's support of the ad campaign; the other thirty-six exhibit strong opposition. Of the thirty-six letters and telephone calls complaining about the ads, twelve (one-third) contain explicit homophobic statements. There is nothing in any of the 1992 AAC ads, however, that even indirectly refers to gays, lesbians, or gay/lesbian issues.

In February 1993, the MBTA promulgated a document entitled "Commercial and Public Service Advertising Policy" ("the Policy"). The Policy contains a mission statement, outlines the approach that the MBTA will take in deciding whether to accept proposed ads, and sets forth a list of guidelines for commercial and public service advertising. Among other things, the guidelines state:

All advertising placed by PTD must meet the same guidelines governing broadcast and private sector advertising with respect to good taste, decency and community standards as determined by the Authority. That is to say, the average person applying contemporary community standards must find that the advertisement, as a whole, does not appeal to a prurient interest.

The advertisement must not describe, in a patently offensive way, sexual conduct specifically defined by the applicable state law, as written or authoritatively construed. Advertising containing messages or graphic representations pertaining to sexual conduct will not be accepted.

The public service advertising guidelines also note that "[t]he purpose of the project being advertised should be such that the advertising methodology can help achieve the objectives and goals of benefitting and educating society," and that "[t]he project should be of sufficient seriousness and public importance to warrant the use of public service advertising space."

In March 1993, AAC submitted another proposed public service ad to the MBTA. The ad included a picture of a condom, and contained a headline stating: "Read this before you get off." Copy beneath the headline read: "Just a reminder to always use a latex condom. Barring abstinence, it's the best way to prevent AIDS. For more information, call the AIDS Action Committee Hotline at 1–800–235–2331." The MBTA rejected this ad. Subsequently, in September 1993, AAC submitted six additional proposed ads to PTD, requesting that they be displayed in October and November 1993. The six ads, each of which contained a picture of a condom, read as follows:

1. Headline: "Haven't you got enough to worry about in bed?" Copy: "Use a latex condom. It might not take your mind off everything during sex, but at least you'll have one less thing to worry about. AIDS. For more information about HIV and AIDS, call the AIDS Action Committee Hotline at 1–800–235–2331."

2. Headline: "Even if you don't have one, carry one." Copy: "A latex condom is the best way to prevent AIDS. So make sure that you've got one on you when it's time to put one on him. For more information about HIV and AIDS, call the AIDS Action Committee Hotline at 1–800–235–2331."

3. Headline: "Simply having one on hand won't do any good." Copy: "For a latex condom to be effective against AIDS, you've got to put it on the correct appendage. Use a condom. Barring abstinence, it's the best way to prevent AIDS. For more information about HIV and AIDS, call the AIDS Action Committee Hotline at 1–800–235–2331."

4. Headline: "You've got to be putting me on." Copy: "You mean you're not using a latex condom every time? You can't be serious. Barring abstinence, it's the best way to prevent AIDS. For more information about HIV and AIDS, call the AIDS Action Committee Hotline at 1–800–235–2331."

5. Headline: "Tell him you don't know how it will ever fit." Copy: "Nothing will give him a swelled head faster than flattery. So compliment him on his good sense in using a latex condom. Barring abstinence, it's the best way to prevent AIDS. For more information about HIV and AIDS, call the AIDS Action Committee Hotline at 1–800–235–2331."

6. Headline: "One of these will make you $\frac{1}{1000}$th of an inch larger." Copy: "Of course, everyone says size doesn't matter. But a thin layer of latex could make all the difference in the world. Use a condom. Barring abstinence, it's the best way to prevent AIDS. For more information about HIV and AIDS, call the AIDS Action Committee Hotline at 1–800–235–2331."

These six ads, together with the ad proposed and rejected in March 1993 (collectively "the 1993 AAC ads"), are the only ones at issue in this litigation. All seven are reproduced as Exhibit B in the Appendix.

The MBTA and PTD reached four different and contradictory conclusions regarding the acceptability of the six ads presented in September 1993. On or about September 30, 1993, PTD accepted ads 1–4, but rejected ads 5 and 6. Two days later, however, PTD told AAC that it could run ad 1 only if it deleted the phrase "in bed," and that it could run ad 3 only if it deleted the phrase "the correct appendage." Later, in the first week of October 1993, the MBTA itself weighed in, informing AAC that it could run ad 2 only if it

omitted the word "him," and that it could run ad 4 only if it rewrote the headline to read "You've got to be kidding." At this same time, the MBTA and PTD informed AAC that ads 5 and 6, which had been previously rejected *in toto*, could run with substantial editorial changes. In the end, the MBTA completely rejected all except ads 3 and 4, and indicated that it would run ad 3 only if AAC edited it. AAC declined to engage in any editing, and none of the ads were run.

Although the MBTA contends on appeal that its decisions regarding the six ads submitted in September 1993 were guided by its written advertising Policy (a claim vigorously disputed by AAC), it made no reference to the Policy in its discussions with AAC. In fact, in the course of this litigation, the MBTA did not specifically identify the portions of the Policy on which it was relying until it filed its Reply Brief, wherein it states: "As AAC well knows, the advertisements were rejected because they violate the MBTA's Policy. Specifically, the advertisements describe sexual conduct in a patently offensive way and contain graphic representations pertaining to sexual conduct." This assertion is called into question, however, by the affidavit of the MBTA's General Manager for Marketing and Communication, Loring Barnes. In explaining why the ads were rejected, Barnes makes no mention of the Policy; instead, while characterizing the ads as "lewd, vulgar, indecent and us[ing] sexually explicit metaphors" (standards which are similar to those set forth in the Policy), Barnes states that "the fact that the ads are unsuitable for viewing by children was the primary factor in the MBTA's [decision]...." Moreover, Barnes avers that the passengers on MBTA cars constitute a captive audience, and implies that this fact requires the MBTA to take passenger sensibilities into account in deciding whether to run a submitted ad. The Policy does not explicitly note that suitability for viewing by children or a captive audience will guide the MBTA's decisions on whether to accept proposed ads.

In October 1993, at roughly the same time it was rejecting the ads submitted by AAC in September 1993, the MBTA accepted and ran two ads for the movie "Fatal Instinct."

Both of these ads prominently feature the bare, crossed legs of a seated woman whose cleavage is visible but whose face is largely obscured. In one of the ads, the woman is suggestively eating a hot dog, and the headline "Come here often?" is displayed at crotch level. In the second ad, the headline "Opening Soon" is displayed at crotch level across the woman's bare, crossed legs. The Barnes affidavit states that "the ad [sic] for the movie 'Fatal Instinct' was vulgar and inappropriate. That ad [sic] never would have been run if it had been brought to the MBTA's attention in advance." The "Fatal Instinct" ads are reproduced as Exhibit C in the Appendix.

Eventually, AAC brought suit against the MBTA and PTD under 42 U.S.C. § 1983 and similar state law provisions, seeking declaratory and injunctive relief. The complaint alleged, *inter alia*, violations of the First Amendment's Free Speech Clause and the Fourteenth Amendment's Equal Protection Clause, and included a facial and as-applied challenge to the constitutionality of the MBTA's Policy. AAC initially requested a preliminary injunction, but at the hearing thereon all parties stipulated that the district court could decide the matter on the merits based upon the existing documentary record.

As one might expect, the record at that early stage in the proceedings was sparse. In addition to copies of all the ads discussed above and a copy of the MBTA's advertising Policy, AAC submitted a verified complaint, which states that AAC's use of sexual innuendo and double entendre in the proposed ads was not gratuitous, but instead was directed at "achiev[ing] a crucial goal of convincing sexually active individuals, particularly adolescents and young adults, to use condoms to prevent the spread of HIV." As the complaint explains:

> The ads are based upon recognition of the principle that appeals to fear are less effective in motivating behavior change and that humor is more likely to achieve the intended effect on the target audience. The ads were specifically aimed at, and designed to overcome, barriers to condom use that have been identified by experts, including adolescents' sense of immortality

and the male ego. Using humor, the ads are designed to take some of the edge off of the otherwise sober message in order to make the intended audience more receptive to it. In the judgment and experience of AIDS Action Committee's staff and of the advertising professionals who designed the ads, this approach is the most effective way to reach and persuade this audience.

AAC also presented a sworn declaration from David H. Mulligan, Commissioner of the Department of Public Health for the Commonwealth of Massachusetts, attesting to the severity of the AIDS crisis among Massachusetts adolescents and expressing his view that the ads at issue "are likely to reach their target audience and therefore will perform a public service." Finally, AAC introduced letters of support from Massachusetts Governor William Weld and Dr. James W. Curran, Assistant U.S. Surgeon General.

The MBTA's submissions also were meager. In addition to the affidavit of Loring Barnes, copies of the 1992 AAC ads, and the letters and summaries of telephone calls we have discussed above, the MBTA introduced examples of less sexually suggestive ads, previously run by the MBTA and other transportation authorities, which advocate the use of condoms to prevent the spread of AIDS. The MBTA also presented a copy of a breast cancer ad to which AAC had referred in its complaint without attaching it as an exhibit. Finally, the MBTA presented an ad inquiry featuring a photograph of an aborted fetus. The MBTA submitted this to underscore its need to "place limits on the ads placed in its trains."

On December 29, 1993, after reviewing the documentary evidence, the district court issued its Memorandum of Decision. *See* 849 F.Supp. at 79. The court first found that the MBTA, by posting ads on a wide variety of topics over the years, by hiring PTD to promote MBTA facilities as advertising venues, and by publishing its advertising Policy, had designated the interiors of its cars as public fora. *Id.* at 83; *see also Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.,* 460 U.S. 37, 45–47, 103 S.Ct. 948, 954–56, 74 L.Ed.2d 794 (1983) (establishing three categories of public property for free speech purposes:

traditional public fora, designated public fora, and nonpublic fora).

Relying on this conclusion, and on the fact that First Amendment standards apply in a designated public forum to the same extent as in a traditional public forum (i.e., a forum [such as a street or park] "which by long tradition or government fiat ha[s] been devoted to assembly and debate," *Perry,* 460 U.S. at 45, 103 S.Ct. at 954), *see, e.g., Board of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 573, 107 S.Ct. 2568, 2571, 96 L.Ed.2d 500 (1987), the court next considered whether the ads could be constitutionally excluded. 849 F.Supp. at 83–84. In so doing, it scrutinized whether the standard by which the ads were rejected was either (1) a content-neutral time, place, or manner restriction, narrowly tailored to serve a significant state interest and leaving open ample, alternative channels of communication; or (2) a content-based restriction, necessary to serve a compelling state interest and narrowly drawn to achieve that end. *Id.; see also Perry,* 460 U.S. at 45–46, 103 S.Ct. at 954–55 (reciting the permissible speech restrictions in traditional and designated public fora). After noting the ambiguity as to whether the MBTA excluded the ads pursuant to its written advertising Policy or under some unwritten policy alluded to in the Barnes affidavit, 849 F.Supp. at 83 n. 6, the district court determined that the exclusions were content-based, and that whatever standard guided them had to be both necessary to serve a compelling state interest and narrowly drawn to achieve that end, *id.* at 84.

Finally, the court decided that the state interests allegedly dictating the challenged exclusions—the protection of both children and the sensibilities of a captive audience—were not, in the context of this case, compelling. *Id.* Accordingly, it permanently enjoined the MBTA from refusing to accept and display in its cars and on its train platforms the six advertisements originally submitted in September 1993. *Id.* at 85. In what appears to have been an oversight, the judgment failed to mention the ad submitted in March 1993. *See id.* The court also permanently enjoined the MBTA from using its advertising Policy "as a basis for rejecting

non-obscene and non-defamatory public service advertisements on the basis of their content." *Id.* This appeal followed.

## II.

■ When faced with a party's appeal from an adverse ruling after a bench trial on the merits, our role as an appellate tribunal ordinarily is quite circumscribed. While we review *de novo* the district court's legal determinations, we accord a significant amount of deference to the court's factual determinations and to most of its resolutions of mixed fact/law issues, letting them stand unless they are clearly erroneous. *See, e.g., Williams v. Poulos,* 11 F.3d 271, 278 and n. 11 (1st Cir.1993).

■ In cases like this one, however, where the trial court is called upon to resolve a number of mixed fact/law matters which implicate core First Amendment concerns, our review, at least on these matters, is plenary so that we may reduce the likelihood of " 'a forbidden intrusion on the field of free expression.' " *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 729, 11 L.Ed.2d 686 (1964)). The *Bose* rule recognizes that the meaning of a particular legal standard—e.g., the meaning of "actual malice" in a product disparagement action—often "cannot be adequately expressed in a simple statement," and must be developed through case-by-case adjudication. *Id.* at 503, 104 S.Ct. at 1961. It also recognizes a heightened need for vigilance and consistency when that standard is supplied by the Constitution, particularly by the First Amendment. *See id.* at 503–04, 104 S.Ct. at 1961. *De novo* review of the trial court's application of a First Amendment standard to the facts before it "ensures that the federal courts remain zealous protectors of First Amendment rights." *Duffy v. Sarault,* 892 F.2d 139, 142–46 (1st Cir.1989).

■ These principles provide a self-evident corollary to the oft-cited maxim that we, as an appellate court, are "free to affirm the judgment below on any independently sufficient ground made manifest by the record."

*See, e.g., Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 204 (1st Cir.1994). The corollary is that, so long as the record is adequately developed, we will not hesitate to resolve a mixed fact/law issue involving a core First Amendment concern even though the district court did not address it in the first instance. This rule furthers the interest of judicial economy by avoiding the remand of a question over which we eventually will exercise full review; it also serves the interest of expediency on questions—e.g., the legality of a prior restraint of speech—where a timely ruling is often crucial.

## III.

On appeal, the MBTA makes several arguments, which we rearrange for ease of analysis. First, the MBTA argues that the district court erred in finding that the denial of the proposed ads was not effectuated pursuant to a narrowly-tailored, content-neutral manner regulation. Next, the MBTA contends that the district court erred in finding that the interiors of its cars are designated public fora, and that this erroneous conclusion led the court to apply too strict a level of scrutiny to the exclusion of the ads. Finally, the MBTA asserts that even if the court did not err in its designated public fora finding, it erred in concluding that the exclusion did not pass constitutional muster under heightened scrutiny.

As we shall explain, we think that the district court correctly determined that the MBTA's rejection of the ads was content-based. Accordingly, we reject the MBTA's first appellate argument. We do not reach the MBTA's second and third appellate arguments, however, because we find that, in rejecting the 1993 AAC ads while running the "Fatal Instinct" ads, the MBTA engaged in content discrimination which gave rise to an appearance of viewpoint discrimination, and that it has failed to explain that appearance away. *Cf. Bose,* 466 U.S. at 505, 104 S.Ct. at 1962 ("The principle of viewpoint neutrality that underlies the First Amendment itself ... imposes a special responsibility on [appellate] judges whenever it is claimed that a particular communication is unprotected.") (citation omitted).

### A. Content–Based vs. Content–Neutral Restrictions

■ As we have noted, the MBTA renews its argument, first made to the district court, that the Policy by which the 1993 ads were excluded is a content-neutral restriction on the manner in which messages may be conveyed on its cars. In the MBTA's view, its disallowance of "sexually explicit or patently offensive language to convey ... substantive message[s]" is more akin to a paradigmatic manner regulation (e.g., a prohibition of megaphones) than it is to a typical regulation which suppresses speech on the basis of its content (e.g., a prohibition of public service ads which discuss abortion). Even if we accept *arguendo* that the 1993 AAC ads are "sexually explicit" or "patently offensive" and that the ads actually were excluded pursuant to the Policy, we find the MBTA's argument to be seriously flawed.

■ Although it might be reasonable, in an analytical vacuum, to characterize a prohibition on the use of sexually explicit or patently offensive language to communicate an idea as a limitation on the "manner" in which a speaker may speak, such a characterization flies in the face of how the Supreme Court has construed the concept of manner through case-by-case adjudication. *Cf. Bose,* 466 U.S. at 503, 104 S.Ct. at 1961. The Court has defined the term narrowly, making clear that, in order to be considered a valid manner restriction, a regulation cannot be aimed at the communicative impact of expressive conduct. *See* Laurence A. Tribe, *American Constitutional Law,* § 12–2, at 791–92 (2d ed. 1988). This is made manifest by the overarching requirement that a time, place, or manner restriction be *content-neutral. See Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55. Thus, the Supreme Court rejected the argument that the statute under which Paul Robert Cohen was convicted for wearing a jacket bearing the words "Fuck the Draft," as applied to Cohen in that case, was a valid regulation of the manner in which he exercised his constitutional right to speak freely. *See Cohen v. California,* 403 U.S. 15, 19–26, 91 S.Ct. 1780, 1785–89, 29 L.Ed.2d 284 (1971). Central to the *Cohen* Court's reasoning was a disagreement with "the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process." *Id.* at 26, 91 S.Ct. at 1788; *cf. Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 51, 108 S.Ct. 876, 879, 99 L.Ed.2d 41 (1988) (recognizing the need to keep "individual *expressions* of ideas ... free from governmentally imposed sanctions") (emphasis supplied). Clearly then, a regulation which permits an idea to be expressed but disallows the use of certain words in expressing that idea is content-based.

The two cases cited by the MBTA in arguing that its Policy is content-neutral actually support a contrary conclusion. In *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), a case which upheld the right of school authorities to discipline a student for "indecently lewd and offensive speech" at a school assembly, *see id.* at 685, 106 S.Ct. at 3165, the Court in no way indicated that the school disciplinary rule forbidding "obscene, profane language" was content-neutral. Rather, a fair reading of the opinion in context makes apparent that the Court viewed the rule as content-based. *See generally id.* at 681–86, 106 S.Ct. at 3163–66. Indeed, the Court is quite clear that the school's need to counter the *content* of the student's speech, and not the need to regulate the incidental and noncommunicative impact of the speech, justified the disciplinary action taken. *Id.* at 685, 106 S.Ct. at 3165 ("[I]t was perfectly appropriate for the school to disassociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education.").

In *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), a case in which the Court upheld the right of the Federal Communications Commission to regulate the radio broadcast of "indecent" language in a monologue by the comedian George Carlin, the Court was even more explicit. It noted:

The words of the Carlin monologue are unquestionably "speech" within the meaning of the First Amendment. It is equally clear that the Commission's objections to

the broadcast were based in part on its content. The [Commission's] order must therefore fall if, as Pacifica argues, the First Amendment prohibits all governmental regulation that depends on the content of speech.

*Id.* at 744, 98 S.Ct. at 3037–38. As it did in *Bethel,* the Court went on to hold that the content-based regulations at issue were justified under the facts and circumstances of that particular case. *Id.* at 748–51, 98 S.Ct. at 3039–41.

Here, there can be no doubt that the MBTA's Policy, on its face and as applied to AAC's proposed ads, is not content-neutral. The Policy does not allow communication of the underlying message by means of any words which enjoy First Amendment protection; instead, it limits the universe of words the speaker may select to those which are not, in PTD's and/or the MBTA's view, "sexually explicit" or "patently offensive." Hence, the district court correctly declined the MBTA's invitation to treat it as a time, place, or manner restriction. *See Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55.

## B. Viewpoint Discrimination

■ In its complaint, AAC raised the issue of viewpoint discrimination by noting that the MBTA was excluding its ads at the same time it was running, *inter alia,* the ads for the movie "Fatal Instinct." The district court never reached this issue, finding instead that the MBTA, having designated the interiors of its cars as public fora, lacked a compelling basis for excluding the 1993 AAC ads, and further finding that the MBTA's Policy was unconstitutional on its face.

It is exceedingly difficult to say whether the MBTA has designated the interiors of its cars as public fora on the record before us. As we have already noted, the record is not particularly well developed. On the one hand, AAC has provided us with precious little evidence of the MBTA's practice in accepting or rejecting ads over the past few years. On the other hand, despite the MBTA's attempts to present itself as a vigilant gatekeeper, the only ads other than the 1993 AAC ads that we know the MBTA recently rejected are certain Calvin Klein ads which somehow might have been misconstrued as endorsing the Ku Klux Klan, and an animal rights ad featuring a photograph of a maimed dog. We appreciate that the parties are anxious to have us settle the public forum question. Because we do not even know whether and when the written advertising Policy went into effect, however, and because we find in the record an independently sufficient ground for affirming the district court, we decline to anchor an important First Amendment ruling on so fragile a foundation.

Our decision not to reach the public forum question is informed by an additional consideration: the relatively murky status of the public forum doctrine. On the one hand, the Supreme Court, in a pre-*Perry* case, indicated that public mass transit organizations, acting in proprietary capacities, may allow a significant amount of public discourse while still constitutionally excluding broad categories of speech based on content. *See Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (upholding city's right to exclude political advertising from its rapid transit system). And, in several recent cases, the Court has used language suggesting that, in determining whether the government *qua proprietor* has designated public property to be a public forum, courts should be highly deferential to the government's decisions to regulate speech. *See International Soc'y for Krishna Consciousness, Inc. v. Lee,* —— U.S. ——, ——, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992) (holding the vestibules of the three major airports in the New York City area not public fora); *United States v. Kokinda,* 497 U.S. 720, 725, 110 S.Ct. 3115, 3118–19, 111 L.Ed.2d 571 (1990) (holding sidewalk outside post office not a public forum). Indeed, these cases suggest that courts should hinge their analyses largely on whether the government *intended* that the property become a designated public forum. *See Lee,* —— U.S. at ——, 112 S.Ct. at 2706; *Kokinda,* 497 U.S. at 725, 110 S.Ct. at 3118–19; *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985) (holding the Combined Federal Campaign for charitable fundraising

not a public forum). Broadly read, *Lee, Kokinda,* and *Cornelius* suggest that the very existence of the MBTA's written Policy may be a sufficient basis for finding that the interiors of MBTA cars are not public fora.

On the other hand, the Court also has stated that the government's intent must be gleaned from its policy and practice with respect to the property at issue. *See Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449; *see also Grace Bible Fellowship, Inc. v. Maine School Admin. Dist. No. 5,* 941 F.2d 45, 47 (1st Cir.1991) (in determining whether the government has designated some property to be a public forum, "actual practice speaks louder than words"). It also has indicated that it will not infer an intent not to designate a public forum solely from the fact that the government excluded certain speech or speakers in the case before it. *See Lamb's Chapel v. Center Moriches Union Free School Dist.,* — U.S. —, —, 113 S.Ct. 2141, 2146, 124 L.Ed.2d 352 (1993) (evidencing a willingness to find that a public school district had designated certain property as a public forum, even in the face of contrary protestations, where the property "is heavily used by a wide variety of private organizations"). These cases indicate that evidence not currently in this record may well drive the determination whether the interiors of MBTA cars are public fora.

▮ At any rate, we turn now to the question of viewpoint discrimination—or more specifically, the unrebutted *appearance* of viewpoint discrimination—which we think disposes of this appeal. Throughout the course of these proceedings, the MBTA has asserted that it has been viewpoint neutral because it has in no way opposed the message that wearing a latex condom is an effective means of preventing the transmission of HIV. If this assertion accurately characterized the level of specificity at which AAC is making its viewpoint discrimination claim, we would have to agree. It is abundantly clear that the MBTA has not opposed expression of the view that the use of condoms is effective in the fight against AIDS.

AAC's two-part viewpoint discrimination argument, which we cull from its complaint, is, however, more specific. First, AAC points out that the MBTA has engaged in content discrimination by applying its Policy to disallow *AAC*'s use of sexual innuendo and double entendre to communicate its messages while simultaneously permitting other advertisers to communicate their messages through these modes of expression and at levels of explicitness equalling, if not exceeding, that in the AAC ads. Second, AAC contends that this content discrimination is prohibited even in a nonpublic forum (where the underlying speech might be otherwise proscribable) because it gives rise to an appearance of viewpoint discrimination which the MBTA has failed to explain away. We find this argument persuasive.

Even if we again assume *arguendo* that the MBTA has correctly characterized the AAC ads as sexually explicit and/or patently offensive, that it has excluded them pursuant to its written Policy, and that it may constitutionally proscribe sexually explicit and/or patently offensive speech in its cars, we must decide whether the content discrimination inherent in the MBTA's decision to run the "Fatal Instinct" ads, while not running the AAC ads, is permissible. After all, we think the presence of content discrimination in the MBTA's application of its Policy cannot seriously be disputed. The "Fatal Instinct" ads are at least as sexually explicit and/or patently offensive as the AAC ads. Their headlines are as suggestive as the most daring of the AAC ads; they contain provocative photographs not found in the AAC ads; and they involve a less protected type of speech—commercial speech—than that in the AAC ads. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 772 n. 24, 96 S.Ct. 1817, 1830 n. 24, 48 L.Ed.2d 346 (1976) (noting that commercial speech has "a different degree of protection").

The most recent and authoritative statement on the permissibility *vel non* of content discrimination within the context of proscribable speech is found in Justice Scalia's majority opinion in *R.A.V. v. City of St. Paul, Minnesota,* — U.S. —, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). We quote from *R.A.V.* at some length, because we believe it highly relevant to this case:

Even the prohibition against content discrimination that we assert the First Amendment requires is not absolute. It applies differently in the context of proscribable speech than in the area of fully protected speech. The rationale of the general prohibition, after all, is that content discrimination raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace. But content discrimination among various instances of a class of proscribable speech does not pose this threat.

When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists. Such a reason, having been adjudged neutral enough to support exclusion of the entire class of speech from First Amendment protection, is also neutral enough to form the basis of distinction within the class. To illustrate: A State might choose to prohibit only that obscenity which is the most patently offensive *in its prurience*— *i.e.*, that which involves the most lascivious displays of sexual activity. But it may not prohibit, for example, only that obscenity which includes offensive *political* messages. And the Federal Government can criminalize only those threats of violence that are directed against the President, since the reasons why threats of violence are outside the First Amendment (protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur) have special force when applied to the person of the President. But the Federal Government may not criminalize only those threats against the President that mention his policy on aid to inner cities. And to take a final example, a State may choose to regulate price advertising in one industry but not in others, because the risk of fraud (one of the characteristics of commercial speech that justifies depriving it of full First Amendment protection), is in its view greater there. *But a State may not prohibit only that commercial advertising that depicts men in a demeaning fashion.*

*Id.* at ——, 112 S.Ct. at 2545–46 (citations and internal quotation marks omitted) (third emphasis supplied). Largely on the basis of these principles, the majority went on to strike down as facially unconstitutional a city ordinance which criminalized the expression of only those "fighting words" (a proscribable type of speech, *see Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942)) based on "race, color, creed, religion or gender." *Id.* at ——, 112 S.Ct. at 2547. It did so because the content discrimination countenanced by the statute was the sort that gave off the appearance of hostility to certain viewpoints, *see R.A.V.*, —— U.S. at ——, 112 S.Ct. at 2547–48, and because the City of St. Paul's comments and concessions in the case not only failed to dispel this appearance but confirmed it as reality, *id.* at ——, 112 S.Ct. at 2549.

The MBTA's decision not to run the AAC ads while running the "Fatal Instinct" ads, like the City of St. Paul's decision to criminalize certain types of fighting words while leaving others legal, constitutes content discrimination which gives rise to an appearance of viewpoint discrimination. And, the MBTA has not dispelled this appearance. The MBTA has not attempted to articulate a neutral justification for what happened; instead, it has stated that running the "Fatal Instinct" ads was a mistake. But this statement is unpersuasive, and by no means counters the impression of discrimination.

The record basis for the claim of mistake is a single sentence in a multi-page affidavit submitted by the MBTA asserting, as we have stated, that "[t]hat ad [sic] would never have been run if it had been brought to the MBTA's attention in advance." There is no suggestion, however, that the MBTA remained unaware of the "Fatal Instinct" ads or made any effort to remove them. Nor is there any explanation as to why, under whatever screening process exists, the MBTA is able to detect threats from written double entendres but unable to detect highly provocative pictures (which themselves bear legends containing obvious double entendres!).

■ One might easily infer that ads tend to be screened not because they threaten to

violate the Policy but because they appear likely to generate controversy or, even more surely, where controversy actually results. The 1992 AAC ads were accepted, quite consciously after an initial dispute, and the subsequent ones were rejected only after a number of public letters of protest. The "Fatal Instinct" ads are more overtly sexual and more blatantly exploitative; but they represent the *conventional* exploitation of women's bodies for commercial advertising. The condom ads, by contrast, represent sexual humor addressed to men's bodies and—because of the connection to AIDS—are also capable of provoking homophobic reactions from the public, and did.

These circumstances also lend themselves at least to an appearance of viewpoint discrimination. Regardless of actual motivation, grave damage is done if the government, in regulating access to public property, even appears to be discriminating in an unconstitutional fashion. And this appearance is only aggravated when the sources may seem to lie in demeaning stereotypes and phobias. In all events, the MBTA has not effectively removed the taint of apparent discrimination.

The MBTA seeks to explain its original acceptance of the condom ads, and their later rejection, as a response to the adoption of its Policy in the meantime. But the Policy explains almost nothing: its language has at best doubtful application to the condom ads but the most vivid application to the "Fatal Instinct" ads, which are manifestly designed to appeal to a prurient interest and certainly contain "graphic representations pertaining to sexual conduct. . . ."

The Policy itself is almost impossible to understand. The purported exclusion of all messages or representations "pertaining to sexual conduct" is so vague and broad that it could cover much of the clothing and movie advertising commonly seen on billboards and in magazines. The prior sentence, relating to patently offensive descriptions, is mysteriously connected to unspecified state laws. The prurient interest reference appears to be derived from one portion of the Supreme Court's obscenity definition, but one never intended as a stand-alone criterion of obscenity. And, significantly, the MBTA does not claim that the condom ads themselves are constitutionally obscene.

We think that the opportunities for discrimination created by this Policy have been borne out in practice, and that this case presents an unrebutted claim of discrimination in the application of supposedly neutral standards. It makes no difference whether AAC prefers a broader ruling or whether, as the MBTA claims, AAC failed technically to preserve an equal protection objection. First Amendment litigation of this kind has consequences that go far beyond the individual parties. We think that the more far-reaching issue that both sides might prefer to address (i.e., the public forum issue) is not yet suited for resolution, and that, on this record, the MBTA's action can properly be set aside on the narrow basis set forth.

### *IV.*

It remains to consider the remedial judgment adopted by the district court. In substance, it declared that the Policy violates the First and Fourteenth Amendments, and that the MBTA's failure to accept the AAC ads violates those constitutional provisions. The judgment also enjoined the Policy's future use as a basis for rejecting non-obscene and non-defamatory advertisements, and directed that the specific condom ads in question be displayed. Our own rationale prompts us to provide a somewhat different gloss on the relief to be afforded.

We think that the Policy in its present form is scarcely coherent, invites the very discrimination that occurred in this case, and was properly enjoined. Similarly, absent a rational and neutral policy, implemented in a non-discriminatory fashion, we see no basis for excluding the present condom ads, nor any that are strictly comparable. To this extent, we affirm the declarations and injunctions ordered by the district court. At this time and on this record, however, we are not prepared to determine that the MBTA is a designated public forum.

Accordingly, if the MBTA chooses to develop a different set of rules or criteria, we are unwilling to foreclose the possibility that

they might be sustained on a different and better developed record, even if those rules or criteria condemn some or all the ads in question. Conversely, AAC would, in that eventuality, be entitled to argue that the ads are protected *simpliciter* and without regard to any discrimination.

Before concluding, we make one final point. Lest we give the impression that we are endorsing the remedying of a perceived wrong (the running of the "Fatal Instinct" ads) with a second wrong (the running of potentially proscribable AAC ads), we note that the controversial ads that will be run as a result of this litigation, like the "Fatal Instinct" ads, are most certainly *not* obscene, and fall well within the heartland of speech that we, as a secure society, should be willing to tolerate in the marketplace of ideas. We would, of course, look askance on a judicial decree which sought to rectify an impermissible viewpoint-based exclusion of, for example, an obscene ad by ordering the government to run the ad. But such is not the case here.

In the end, the MBTA may well be entitled to exclude from the interiors of its cars speech containing a certain level of sexual innuendo and double entendre. We do not reach that question at this time. To do so constitutionally, however, it will, at the least, need to act according to neutral standards, and it will need to apply these standards in such a way that there is no appearance that "the [government] is seeking to handicap the expression of particular ideas." *R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2549. We recognize that this requires the government to apply its standards quite precisely. This is the burden the government assumes, however, when it undertakes to proscribe speech on the basis of its content.

The judgment of the district court is *affirmed,* with the modifications to the injunction noted above. No costs.

14

EXHIBIT A

condom posters revised 11/12/92 5:10 PM Page 7

# It'll grow on you.

Use a latex condom. You'll get used to it. It's thin, stretchable, and the best way to prevent AIDS. For more information, call the AIDS Action Committee at 1-800-235-2331.

# Ménage à trois.

Make sure you have enough latex condoms to go around. It's the best way to prevent AIDS. For more Information, call the AIDS Action Committee at 1-800-235-2331.

condom posters revised 0/12/92 5:10 PM Page 5

# You'll last longer wearing a condom.

Sure, you may sacrifice a little sensitivity when using a condom. But isn't that better than sacrificing your life? Use a latex condom. It's the best way to prevent AIDS. For more information, call the AIDS Action Committee at 1-800-235-2331.

# Add an extra layer before you get under the covers.

If you're going to have sex, make sure you take a latex condom to bed. It's the best way to prevent AIDS. For more information, call the AIDS Action Committee at 1-800-235-2331.

condom poslers revised  8/12/92  5:10 PM  Page 4

Or, you can stick your head in the sand.

Ignoring the AIDS epidemic isn't going to make it go away. But using a latex condom will help prevent spreading it further. For more information, call the AIDS Action Committee at 1-800-235-2331.

condom poster revised 6/12/92 6:10 PM Page 3

# Put on your thinking cap.

If you've been thinking with a part of your anatomy other than your brain, at least think smart. Use a latex condom. It's the best way to prevent AIDS. For more information, call the AIDS Action Committee at 1-800-235-2331.

# Finally, a roll-on with the protection you really need.

If the thought of AIDS makes you sweat, use a latex condom. It's the best way to prevent sexually transmitted diseases. For more information, call the AIDS Action Committee at 1-800-235-2331.

condom posters revised 8/12/92 5:00 PM Page 1

EXHIBIT B

# Read this before you get off.

Just a reminder to always use a latex condom. Barring abstinence, it's the best way to prevent AIDS For more information, call the AIDS Action Committee Hotline at 1-800-235-2331.

# Haven't you got enough to worry about in bed?

Use a latex condom. It might not take your mind off everything during sex, but at least you'll have one less thing to worry about. AIDS. For more information about HIV and AIDS, call the AIDS Action Committee Hotline at 1-800-235-2331.

# Simply having one on hand won't do any good.

For a latex condom to be effective against AIDS, you've got to put it on the correct appendage. Use a condom. Barring abstinence, it's the best way to prevent AIDS. For more information about HIV and AIDS, call the AIDS Action Committee Hotline at 1-800-235-2331.

# Even if you don't have one, carry one.

A latex condom is the best way to prevent AIDS. So make sure you've got one on you when it's time to put one on him. For more information about HIV and AIDS, call the AIDS Action Committee Hotline at 1-800-235-2331.

# Tell him you don't know how it will ever fit.

Nothing will give him a swelled head faster than flattery. So compliment him on his good sense in using a latex condom. Barring abstinence, it's the best way to prevent AIDS. For more information about HIV and AIDS, call the AIDS Action Committee Hotline at 1-800-235-2331.

**One of these will make you 1/1000th of an inch larger.**

Of course, everyone says size doesn't matter. But a thin layer of latex could make all the difference in the world. Use a condom. Barring abstinence, it's the best way to prevent AIDS. For more information about HIV and AIDS, call the AIDS Action Committee Hotline at 1-800-235-2331.

**You've got to be putting me on.**

You mean you're not using a latex condom every time? You can't be serious. Barring abstinence, it's the best way to prevent AIDS. For more information about HIV and AIDS, call the AIDS Action Committee Hotline at 1-800-235-2331.

EXHIBIT C

Copley Square MBTA Station - Inbound
Back Bay MBTA Station

Copley Square MBTA Station - Outbound
Downtown Crossing MBTA Station - Outbound

Photos by Marilyn Humphries