**Juan DALMAU RODRIGUEZ, et al., Plaintiffs, Appellants,**

v.

**HUGHES AIRCRAFT COMPANY, et al., Defendants, Appellees.**

**No. 85–1303.**

United States Court of Appeals, First Circuit.

Argued Oct. 9, 1985.

Decided Jan. 9, 1986.

Francisco M. Troncoso with whom Paul E. Calvesbert and Calvesbert & Brown, San Juan, P.R., were on brief for plaintiffs, appellants.

Francisco Ponsa-Flores with whom Francisco Ponsa-Feliu, Edda Ponsa-Flores, and Lawrence E. Duffy, San Juan, P.R., were on brief for defendants, appellees.

Before BOWNES, Circuit Judge, TIMBERS,* Senior Circuit Judge, TORRUELLA, Circuit Judge.

BOWNES, Circuit Judge.

This is an appeal from a dismissal of plaintiffs' diversity tort action against defendant Hughes Helicopters, Inc.[1] of California for lack of personal jurisdiction. The question is whether Hughes' contacts with Puerto Rico were sufficient under Puerto Rico law and the due process clause of the Constitution to subject it to the jurisdiction of the United States District Court for Puerto Rico.

## THE FACTS

When jurisdiction is contested, the burden is on the plaintiff to prove facts necessary to sustain jurisdiction. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 904 (1st Cir.1980). This action arose when a helicopter manufactured by Hughes and owned by the Police Department of Puerto Rico crashed on April 20, 1981, seriously injuring its two police occupants. The jurisdictional facts began with the acquisition by the Police Department of the helicopter that crashed.

* Of the Second Circuit, sitting by designation.    1. Now Hughes Aircraft Company.

On July 15, 1980, the General Services Administration of Puerto Rico solicited bids for two helicopters for the Police Department. Bids were submitted by Enstrom Corporation, Carib Aviation, Inc. of Miami, Florida, Hughes, and Helicopter Rental Co., a Puerto Rico company. Carib, Hughes, and Helicopter Rental all bid to sell the same helicopter, a model 300C Hughes helicopter. Enstrom bid to sell its own model, F–28C–2 helicopter. After consideration, the Puerto Rico GSA determined that the 300C Hughes machine was superior to the Enstrom. The Enstrom bid, which was the lowest, was, therefore, rejected. The next lowest bidder, Carib, was rejected because it did not submit a bid for the installation of the radios as called for in the specifications. Hughes, which submitted the third lowest bid, was eliminated because it did not submit a bid for the spare parts and special tools as required in the invitation to bid. Helicopter Rental was awarded the contract. It agreed to furnish two model 300C Hughes helicopters, optional equipment, spare parts, tools, freight, insurance, and training for pilots and mechanics for the sum of $272,995.

Hughes submitted its bid by mail and did not appear in person when the bids were opened. Hughes is incorporated in Delaware with its principal place of business in Culver City, California. At no time has it been authorized to do business in Puerto Rico and it has never done business there through any employee, agent or subsidiary. Hughes had no bank account in the Commonwealth and never owned or leased real or personal property located in Puerto Rico. The only personal contact Hughes had with Puerto Rico prior to its bid was a visit to the Island in 1977 or 1978 by its international sales representative, George Hurd, who went there as a guest of Carib Aviation and Marine Consultants, which was Hughes' distributor for the Caribbean area at the time. After the sale, Ray Stephens, a Hughes technician, went to Puerto Rico from February 23 to 25, 1981, to give assistance and advice relative to the drive shaft alignments of the two helicopters. Stephens also went to Puerto Rico in April of 1981 to help in the investigation of the crash. This constitutes all of Hughes' direct contacts with Puerto Rico.

Prior to receiving the invitation to bid, Augustine Carrasco, owner of Helicopter Rental, had seen an advertisement of Hughes in one of the trade journals or magazines that he received. He sent a request to the magazine for more information about Hughes helicopters and received a list of the commercial marketing personnel. Carrasco contacted the Eastern Sales Division of Hughes and was referred to one Robert F. Todd who, Carrasco was told, covered the Puerto Rico area. He told Todd about the bid request for the purchase of two helicopters by the Puerto Rico Police Department. According to Carrasco's sworn statement, he contacted Todd after he received the invitation to bid "on or about July 15, 1980." [2] Carrasco was informed by Todd that the two helicopters could be furnished by his office and Todd gave Carrasco all of the financial information needed to comply with the bid specifications.

After his company was awarded the bid, Carrasco called Todd who advised him to come to Atlanta, Georgia, and make a deposit for the two helicopters. When Carrasco got to Atlanta, he was informed by Todd that the two helicopters had been "optioned" by Hughes to Carib Helicopters, Inc. of Miami.[3] Todd said, however, that if Carrasco paid an additional $5,000 for each machine, he could arrange for them to be delivered to the Puerto Rico Police Depart-

**2.** There is a letter in the record, Exhibit 2, from Todd to Carrasco dated June 8, 1980, to which was attached "a print out showing the finite life and TBO components of the Hughes 300C cost of operation financial summary." The letter gives other cost information about the 300C Hughes helicopter and recommends that Carrasco "have the aircraft flown to P.R. from the Hughes plant." The discrepancy in dates was not explained.

**3.** Carib Aviation, Inc., the rejected bidder, and Carib Helicopters, Inc. have the same Miami address so, for our purposes, we treat them as a single entity.

ment but, if the payment was not made, Carrasco would have to wait until the helicopters came off the production line, which meant delivery after October of 1980. Since Carrasco had to make immediate delivery of the helicopters, he paid the additional $10,000.

Todd wrote to Carrasco on October 10, 1980, telling him that the helicopters would be ready for pick up at Culver City on October 15. By telex of October 17, 1980, Carib authorized Hughes to accept payment in the amount of $181,700 from Carrasco for the two machines and deliver them to Alex Air. Carrasco instructed Alex Air as to how and where the helicopters were to be shipped. They arrived in San Juan, Puerto Rico, before the end of October and were delivered to the Puerto Rico Police Department. For some reason, the spare parts did not arrive with the helicopters. Carrasco called Todd and the parts arrived in Puerto Rico in different shipments, some consigned directly to the Puerto Rico Police Department and others consigned to Helicopter Rental.

The papers show that the helicopters were sold by Hughes to Carib. The bills of sale ran from Hughes to Carib, as did the warranties. There was evidence that a Hughes warranty could be transferred to the first subsequent purchaser. Hughes had a helicopter service center agreement with Carib whereby Carib was authorized as a factory inspection and service center for Hughes "on a non-exclusive basis." The agreement specifically provided that Carib was to furnish service "as an independent contractor and not as agent or manufacturer."

THE LAW

In its definitive opinion on the reach of Puerto Rico's long-arm statute, the Supreme Court of Puerto Rico held that *in personam* jurisdiction extends to all cases where it is constitutionally permissible. *A.H. Thomas Co. v. Superior Court of Puerto Rico*, 98 P.R.R. 864, 870 n. 5 (1970). Our inquiry into the requirements of state-law jurisdiction is, therefore, telescoped into our due process constitutional analysis.

The starting point is *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), which laid down the jurisdictional principle that

due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278.

*Id.* at 316, 66 S.Ct. at 158. The Court stated that an estimate of the inconveniences which would result to the corporation from a trial away from its principal place of business was relevant in determining whether the demands of fair play and substantial justice had been met. *Id.* at 317, 66 S.Ct. at 158. It went on to explain that there could be instances in which the continuous corporate operations within a state could be thought so substantial and of such a nature as to justify suit against it on causes of actions arising from dealings entirely distinct from its continuous activities. *Id.* at 318, 66 S.Ct. at 159. The Court stated that as a general rule the commission of some single or occasional acts of the corporate agent in a state would not suffice to establish jurisdiction over the corporation. It pointed out, however, that some acts "because of their nature and quality and the circumstances of their commission," could be deemed sufficient in and of themselves to render the foreign corporation liable to suit. *Id.* at 318, 66 S.Ct. at 159.

*International Shoe*'s main theme of "minimum contacts" and "traditional notions of fair play and substantial justice" has been replayed consistently by the Court with some variations and modifications. In *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), the Court held that a contract which had a "substantial connection" with the forum State was a sufficient basis for allowing it to exercise jurisdiction

in a suit based on that contract. *Id.* at 223, 78 S.Ct. at 201. The particular contract involved was a contract of insurance under which a Texas insurance corporation had agreed to insure a California resident. Suit was later instituted by the beneficiary of the insured against the insurer in California state court. The insurer had no office or agent in California, but the Court upheld the jurisdiction of the California court. It noted that the contract was delivered in California, that the premiums were mailed from there and that the insured was a resident of California when he died. *Id.* The Court concluded that California had "manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims." *Id.* The Court pointed out that California residents, especially those having small claims, would be seriously disadvantaged if forced to follow the insurance company to a different state in order to hold it legally accountable, and determined that the comparative inconvenience caused to the insurer by having to litigate in California did not amount to a denial of due process. *Id.* at 224, 78 S.Ct. at 201.

In *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958), the court reiterated the holding of *International Shoe:*

> [I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. *International Shoe Co. v. Washington,* 326 U.S. 310, 319 [66 S.Ct. 154, 159, 90 L.Ed. 95].

The Court found that a Florida court had no jurisdiction to rule on the validity of a trust and power of appointment executed in Delaware with a Delaware trust company as trustee, even though the settlor of the trust was a Florida resident at her death. It distinguished *McGee* on the ground that the trust agreement had no connection with Florida. *Id.* at 252, 78 S.Ct. at 1239.

In *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), a case involving *quasi in rem* jurisdiction, the court held that "all assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny." *Id.* at 212, 97 S.Ct. at 2584 (footnote omitted).

The case most pertinent is *World-Wide Volkswagen Corp. v. Woodson, District Judge of Creek County, Oklahoma,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The issue in *World-Wide* was

> whether, consistently with the Due Process Clause of the Fourteenth Amendment, an Oklahoma court may exercise *in personam* jurisdiction over a nonresident automobile retailer and its wholesale distributor in a products-liability action, when the defendants' only connection with Oklahoma is the fact that an automobile sold in New York to New York residents became involved in an accident in Oklahoma.

*Id.* at 287, 100 S.Ct. at 562. The Court reviewed *International Shoe* and progeny. It noted: "The limits imposed on state jurisdiction by the Due Process Clause, in its role as a guarantor against inconvenient litigation, have been substantially relaxed over the years," *id.* at 292, 100 S.Ct. at 565, but pointed out that despite this relaxation, the due process clause ensures not only fairness but the "orderly administration of the laws," quoting from *International Shoe,* 326 U.S. at 319, 66 S.Ct. at 159. 444 U.S. at 293–94, 100 S.Ct. at 565. Quoting again from *International Shoe,* 326 U.S. at 319, 66 S.Ct. at 159, the Court emphasized that "the Due Process Clause 'does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations.'" 444 U.S. at 294, 100 S.Ct. at 565. It rejected the theory that foreseeability of an injury in states other than the one of manufacture or sale can be a foothold for jurisdiction. 444 U.S. at 295–96, 100 S.Ct. at 566. The foreseeability that the Court saw as critical was not "the mere likelihood that a product will find its way into the forum State. Rather, it is that the

defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." 444 U.S. at 297, 100 S.Ct. at 567. The Court held that the sale of a product must be more than an isolated occurrence to ground jurisdiction, it must arise "from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States." 444 U.S. at 297, 100 S.Ct. at 567. Jurisdiction over a manufacturer is consonant with due process if it "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." 444 U.S. at 298, 100 S.Ct. at 567. The Court found lack of jurisdiction because plaintiffs had no "contacts, ties, or relations" with the forum State. 444 U.S. at 299, 100 S.Ct. at 568.

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), involved a libel suit brought in New Hampshire by a resident of New York against an Ohio corporation. The Court found that defendant's regular circulation of its magazine in New Hampshire was sufficient for jurisdiction. It noted:

> Such regular monthly sales of thousands of magazines cannot by any stretch of the imagination be characterized as random, isolated, or fortuitous. It is, therefore, unquestionable that New Hampshire jurisdiction over a complaint based on those contacts would ordinarily satisfy the requirement of the Due Process Clause that a State's assertion of personal jurisdiction over a nonresident defendant be predicated on "minimum contacts" between the defendant and the State. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–298 [100 S.Ct. 559, 567, 62 L.Ed.2d 490] (1980); *International Shoe Corp. v. Washington*, 326 U.S. 310, 317 [66 S.Ct. 154, 158, 90 L.Ed. 95] (1945).

*Id.* at 774, 104 S.Ct. at 1478.

In another libel case involving the question of jurisdiction decided the same day as *Keeton*, the Court, in finding jurisdiction was proper, quoted *International Shoe*'s statement of the requirements of "minimum contacts" and "traditional notions of fair play and substantial justice." *Calder and South v. Jones*, 465 U.S. 783, 788, 104 S.Ct. 1482, 1486, 79 L.Ed.2d 804 (1984).

*Helicopteros Nacionales De Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) is a variation on the main theme. It involved a foreign corporation that did business in Texas. In rejecting Texas' claim of jurisdiction, the Court held "that mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of *in personam* jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Id.* at 418, 104 S.Ct. at 1874 (footnote omitted). In doing so, it relied on *Rosenberg Bros. & Co. v. Curtis Brown Co.*, 260 U.S. 516, 43 S.Ct. 170, 67 L.Ed. 372 (1923), noting that "[t]his Court in *International Shoe* acknowledged and did not repudiate its holding in *Rosenberg*." 466 U.S. at 418, 104 S.Ct. at 1874.

In the latest jurisdictional case, *Burger King Corporation v. Rudzewicz*, — U.S. ——, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the Court stated that "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State," citing to *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158. — U.S. at ——, 105 S.Ct. at 2183. The Court pointed out that "minimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities," citing to *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. at 292, 100 S.Ct. at 564. — U.S. at ——, 105 S.Ct. at 2185. The Court found that Florida had jurisdiction over a Michigan franchisee of Burger King where the franchisee relationship was established in Florida, governed by Florida law and called for payment of all required fees and relevant notices to be sent to the Florida headquarters in Miami.

Based on *International Shoe* and its now considerable progeny, we find that Hughes' contacts with Puerto Rico are too attenuated to ground jurisdiction. Prior to

the accident, Hughes' only contacts were the submission of the bid, a trip by a Hughes employee for technical help and advice, and a visit by a Hughes sales representative to Puerto Rico in 1977 or 1978. We do not think that attendance by two Puerto Rico Police Department mechanics at Hughes helicopter training school in Culver City, California, qualifies as a contact by Hughes with the forum State. Nor does the crash-investigation visit by a Hughes representative maximize its contacts to a jurisdictional dimension. *See Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d at 905; *Mangual v. General. Battery Corp.*, 710 F.2d 15, 19 (1st Cir.1983).

Appellants' "stream of commerce" theory must be rejected. Assuming that Hughes knew that the destination of the helicopters was Puerto Rico, we do not think that the sale of two helicopters to a police department can be the source of a stream of commerce. This is not like opening up a particular territory for sales to the general public. Nor can the single advertisement of Hughes helicopters that Carrasco saw in a magazine be viewed as the incipient source of a stream of commerce. There is nothing in the record showing that Hughes advertised regularly in magazines circulated in Puerto Rico or aimed its advertising at Puerto Rico. The sale, here, was not a stream or the beginning of one; it was an isolated splash. It was not the type of transaction that could reasonably lead a manufacturer to believe would be the basis for haling him into court in Puerto Rico.

We do not think that whether Hughes knew that the helicopters were being sold to the Puerto Rico Police Department has any jurisdictional significance. The test is not knowledge of the ultimate destination of the product, but whether the manufacturer has purposefully engaged in forum activities so it can reasonably expect to be haled into court there, and, even then, the minimum requirements of "fair play and

substantial justice" may defeat jurisdiction. *Burger King*, —— U.S. at ——, 105 S.Ct. at 2185; *World-Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564. *See Commonwealth of Puerto Rico v. S.S. Zoe Colocotroni*, 628 F.2d 652, 667 (1st Cir.1980). All of the purposeful activities here were initiated and carried on by Carrasco of Helicopter Rental Co. He contacted Hughes to obtain information necessary to submit a bid and then went to Georgia to facilitate the purchase.

Finally, no jurisdictional consequence follows from the fact that Hughes directly or indirectly may have controlled Carib. Carib, whatever its status vis-a-vis Hughes, was a Florida corporation[4] and there is nothing in the record indicating it did any business in Puerto Rico. In *Escude Cruz v. Ortho Pharmaceutical Corp.* we noted that "[t]he mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary." 619 F.2d at 905. There is no jurisdictional footing whatsoever in the dealings between Hughes and Carib.

*Affirmed.*

---

**4.** We are not suggesting that Carib was not a completely independent corporation. This is

merely an *arguendo.*