Ranahan v. Pheasant Wilsons          CV-95-9-SD     05/02/95

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


James J. Ranahan, Jr.;
Deborah Ranahan

    v.                                         Civil No. 95-9-SD

Pheasant Wilsons, Inc., d/b/a
 Wilsons Suede and Leather;
Vanguard Chemical Corporation;
3M Company


O R D E R

In this diversity action, plaintiffs James and Deborah
Ranahan seek to recover damages for personal injuries James
Ranahan allegedly suffered after using a leather protectant spray
manufactured by defendant Vanguard Chemical Corporation
(Vanguard).  Presently before the court is defendant Vanguard's
motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), to which
plaintiff objects.


Background

Plaintiff James Ranahan alleges that on December 23, 1992,
he purchased a leather coat and an aerosol can of "Wilsons
Leather Protector" (leather protectant) from a retail outlet
located in Manchester, New Hampshire, and owned by defendant

Pheasant Wilsons, Inc., d/b/a Wilsons Suede and Leather (Wilsons).  Plaintiff allegedly sustained injuries after using the leather protectant, which was manufactured for Wilsons by defendant Vanguard.

Vanguard is a corporation organized under the laws of the State of Missouri, with its principal and sole place of business in St. Louis, Missouri.  Affidavit of Barry Feldman ¶ 2 (attached to Defendant's Motion as Exhibit A).  Vanguard is licensed to do business only in the State of Missouri; it has never been licensed to do business in the State of New Hampshire.  Id. ¶¶ 3-4.

Vanguard is in the business of formulating and manufacturing leather care products, which are then marketed under private labels or under Vanguard's own labels.  Consumer Product Safety Commission (CPSC) Investigation Report of Dec. 30, 1992 (Plaintiff's Appendix at 21).  Between 1989 and November of 1992, Vanguard manufactured approximately two to three million cans of leather protectant for Wilsons.  In November 1992, as a result of Environmental Protection Agency (EPA) regulations aimed at phasing out the use of one of the leather protectant's ingredients, Wilsons and Vanguard reformulated the leather protectant using different component chemicals.  Id. at 13, 25.

Wilsons placed an initial order for 625,000 cans of

2

reformulated leather protectant. CPSC Report of Dec. 28, 1992 (Plaintiff's Appendix at 10). By December 11, 1992, approximately 440,000 cans of the reformulated leather protectant had been manufactured by Vanguard and sold to Wilsons. CPSC Report (Appendix at 20-21). The products were shipped by Vanguard to Wilsons' distribution centers in California and Minnesota, Feldman Affidavit ¶ 11, and were then distributed by Wilsons to its national chain of 550 retail stores. Wilsons sold approximately 350,000 units of the reformulated product to consumers. CPSC Report (Appendix at 13). Wilsons' sales records further indicate that more than 10,000 units were sold by Wilsons in New Hampshire during November and December of 1992.[1] Wilsons "Receipt-Sales-Returns" Records (Appendix at 3-4).

Wilsons recalled the reformulated leather protectant on December 28, 1992, due to numerous consumer complaints of respiratory problems associated with use of the product. See Recall Announcement (Appendix at 7-8).

---

[1]The court notes that the record does not reveal whether all of the units sold in New Hampshire during this period were the reformulated product in the 5-ounce containers.

## Discussion

### 1. Standard of Proof

When the court considers a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, the prime facie standard must be applied. United Elec. Workers v. 163 Pleasant Street Corp. [Pleasant Street II], 987 F.2d 39, 43 (1st Cir. 1993). Under this standard, the plaintiff has the burden of making a prima facie showing that jurisdiction exists "'based on evidence of specific facts set forth in the record.'" Kopf v. Chloride Power Elecs., Inc., No. 94-391-SD, ___ F. Supp. ___, ___, 1995 U.S. Dist. LEXIS 384, at *23 (D.N.H. Jan. 12, 1995) (quoting Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992)); see also Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995) ("To make a prima facie showing . . ., the plaintiff ordinarily cannot rest upon the pleadings, but is obliged to adduce evidence of specific facts.").

In determining whether a plaintiff has made a prima facie jurisdictional showing, the court accepts all properly supported facts as true, and construes all reasonable inferences in favor of the plaintiff. Foster-Miller, supra, 46 F.3d at 145; Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994). The court is not, however, required to "credit conclusory

4

allegations or draw farfetched inferences." Ticketmaster, supra, 26 F.3d at 203.

2. General Personal Jurisdiction

Plaintiffs assert that there are "continuous or systematic" or "substantial" activities by Vanguard within New Hampshire to warrant the exercise of general jurisdiction over the defendant.

"'General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state.'" Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994) (quoting United Elec. Workers v. 163 Pleasant St. Corp. [Pleasant Street I], 960 F.2d 1080, 1088 (1st Cir. 1992)) (emphasis added), petition for cert. filed, 63 U.S.L.W. 3692 (U.S. Mar. 13, 1995) (No. 94-1517). A court with general jurisdiction over a nonresident defendant may hear any suit against that defendant. See id. at 59.

There is no evidence in the record showing, or even suggesting, that Vanguard engaged in continuous and systematic activity within New Hampshire unrelated to the instant litigation. The court therefore finds that plaintiffs have failed to establish sufficient facts to support a finding that this court has general personal jurisdiction over Vanguard.

5

## 3.  Specific Personal Jurisdiction

> The proper exercise of specific *in personam* jurisdiction hinges on satisfaction of two requirements: first that the forum in which the federal district court sits has a long-arm statute that purports to grant jurisdiction over the defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with the strictures of the Constitution.

Pritzker, supra, 42 F.3d at 60.  See also Ticketmaster, supra, 26 F.3d at 204; Pleasant Street II, supra, 987 F.2d at 43.

### a.  New Hampshire's Long-Arm Statute

The long-arm statute governing the jurisdiction of New Hampshire courts over unregistered foreign corporations is New Hampshire Revised Statutes Annotated (RSA) 293-A:15.10.[2]  McClary

---

[2]RSA 293-A:15.10 provides, in relevant part,

> (b)  A foreign corporation may be served by registered or certified mail, return receipt requested, addressed to the secretary of the foreign corporation at its principal office shown in its application for a certificate of authority or in its most recent annual report if the foreign corporation:
>     (1) has no registered agent or its registered agent cannot with reasonable diligence be served;
>     (2) has withdrawn from transacting business in this state under RSA 293-A:15.20; or
>     (3) has had its certificate of authority revoked under RSA 293-A:15.31.
>     . . . .

v. Erie Engine & Mfg. Co., 856 F. Supp. 52, 55 (D.N.H. 1994).
When the New Hampshire Legislature enacted RSA 293-A:15.10, it
eliminated all of the restrictive long-arm language that had
appeared in the statute's predecessors.  In so doing, this court
has held that the legislature "intended RSA 293-A:15.10 to
authorize jurisdiction over foreign corporations to the full
extent allowed by federal law."  Id.  Accordingly, this court's
exercise of jurisdiction over Vanguard is authorized by RSA 293-
A:15.10 if it comports with the requirements of due process.


        b.  Due Process

    A court's exercise of personal jurisdiction over a
nonresident defendant meets the requirements of due process if
the court finds that the defendant has "certain minimum contacts"
with the forum state "such that the maintenance of the suit does
not offend 'traditional notions of fair play and substantial
justice.'"  International Shoe Co. v. Washington, 326 U.S. 310,
316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).
    "By its very nature, the inquiry into minimum contacts is
far from exact: 'the criteria by which we mark the boundary line

_____

            (d) This section does not prescribe the
        only means, or necessarily the required
        means, of serving a foreign corporation.
RSA 293-A:15.10(b), (d) (Supp. 1994).

7

between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative.'"  Pritzker, supra, 42 F.3d at 60 (quoting International Shoe, supra, 326 U.S. at 319).  Instead, the inquiry is "highly idiosyncratic, involving an individualized assessment and factual analysis of the precise mix of contacts that characterize each case."  Id.

In determining whether its exercise of personal jurisdiction falls "within constitutional bounds," the court employs the following tripartite analysis:

> "First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities.  Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable.  Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable."

Pritzker, supra, 42 F.3d at 60-61 (quoting Pleasant Street I, supra, 960 F.2d at 1089); see also Foster-Miller, supra, 46 F.3d at 144 (due process "implicates three distinct components, namely, relatedness, purposeful availment (sometimes called 'minimum contacts'), and reasonableness") (footnote omitted).

8

## (1) Relatedness

Plaintiff was allegedly injured by using a product which defendant Vanguard manufactured exclusively for Wilsons. Wilsons in turn sold the product through its nationwide chain of retail stores, which includes the New Hampshire store where plaintiff purchased the product.

Based on the evidence before it, the court finds that plaintiff has made a prima facie showing that his claims directly arise out of or relate to defendant Vanguard's contacts with New Hampshire.

## (2) Purposeful Availment

The determination of whether Vanguard purposefully availed itself of the privilege of conducting business within New Hampshire requires the court to interpret and apply the stream-of-commerce theory of personal jurisdiction. In light of the confusion generated by the Supreme Court's most recent attempt to delineate this theory in <u>Asahi Metal Indus. Co. v. Superior Court of Cal.</u>, 480 U.S. 102 (1987), such a task is easier said than done.

Before <u>Asahi</u>, the Supreme Court's position on the stream-of-commerce theory was laid out in <u>World-Wide Volkswagen Corp. v. Woodson</u>, as follows:

> When a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," Hanson v. Denckla, 357 U.S. [235,] 253 [(1958)], it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.

Id., 444 U.S 286, 297-98 (1980) (emphasis added).

Seven years later, in Asahi, the Supreme Court split 4-4-1 over the proper interpretation of the stream-of-commerce theory. The opinion penned by Justice O'Connor and joined by three other justices adopts a narrower view of the World-Wide Volkswagen stream-of-commerce doctrine. Justice O'Connor holds in her opinion that

> [t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose

10

to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.[3]  But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

Asahi, supra, 480 U.S. at 112 (O'Connor, J., plurality).

Justice Brennan, in a separate opinion joined by three other justices, including Justice White, who authored the World-Wide Volkswagen opinion, disagrees with Justice O'Connor's requirement that a plaintiff needs to "show '[a]dditional conduct' directed toward the forum before finding the exercise of jurisdiction over the defendant to be consistent with the Due Process Clause." Asahi, supra, 480 U.S. at 117 (Brennan, J., concurring in part and concurring in the judgment).  Brennan states that such a showing is unnecessary because

[t]he stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being

---

[3]The court notes that this list of additional conduct that may indicate an intent or purpose to serve the market in a forum state is not exhaustive.

11

> marketed in the forum State, the possibility
> of a lawsuit there cannot come as a surprise.
> Nor will the litigation present a burden for
> which there is no corresponding benefit.

Id.

Brennan went on to state that

> [a] defendant who has placed goods in the
> stream of commerce benefits economically from
> the retail sale of the final product in the
> forum State, and indirectly benefits from the
> State's laws that regulate and facilitate
> commercial activity.  These benefits accrue
> regardless of whether that participant
> directly conducts business in the forum
> State, or engages in additional conduct
> directed toward that State.

Id.

Finally, Justice Stevens, who did not join the stream-of-commerce opinions by Justice O'Connor or Justice Brennan, wrote separately to state that the O'Connor "plurality seems to assume that an unwavering line can be drawn between 'mere awareness' that a component will find its way into the forum State and 'purposeful availment' of the forum's market." Asahi, supra, 480 U.S. at 122 (Stevens, J., concurring in part and concurring in the judgment).  Justice Stevens, recognizing that the determination of whether a defendant has purposely availed itself of a forum's market is necessarily fact-driven, states that such determination "is affected by the volume, the value, and the hazardous character of the components" placed into the stream of

12

commerce.  Id.

Prior to Asahi, the First Circuit applied the stream-of-commerce theory from World-Wide Volkswagen in Dalmau Rodriguez v. Hughes Aircraft Co., 781 F.2d 9 (1st Cir. 1986).  In Hughes, the defendant sold two helicopters to a company, knowing that the company intended to resell the helicopters to a police department in Puerto Rico.  The court rejected the plaintiff's stream-of-commerce theory of personal jurisdiction, stating,

> we do not think that the sale of two helicopters to a police department can be the source of a stream of commerce.  This is not like opening up a particular territory for sales to the general public. . . .  The sale, here, was not a stream or the beginning of one; it was an isolated splash.  It was not the type of transaction that could reasonably lead a manufacturer to believe would be the basis for haling him into court in Puerto Rico.

Id. at 15.

In the two stream-of-commerce cases decided by the First Circuit since Asahi, the court has discussed the application of all three stream-of-commerce views expressed in Asahi, but has based its conclusions as to whether jurisdiction is proper on an application of the O'Connor view.  See Benitez-Allende v. Alcan Aluminio Do Brasil, S.A., 857 F.2d 26 (1st Cir. 1988), cert. denied, 489 U.S. 1018 (1989); Boit v. Gar-Tec Products, Inc., 967 F.2d 671 (1st Cir. 1992).  However, in the second of those

13

opinions, the First Circuit further noted that it was "not persuaded that the opinions in Asahi have undermined [the First Circuit's earlier opinion in] Hughes." Boit, supra, 967 F.2d at 683.

In Benitez-Allende, the defendant, a Brazilian manufacturer of pressure cookers, hired an "export advisor" who traveled into Puerto Rico where he met and entered into an agreement with a sales representative. This representative subsequently traveled to Puerto Rico at least four times per year to solicit orders for the defendant's pressure cookers from wholesalers and retailers. During the relevant five-year time period, the defendant sold 240,000 pressure cookers in Puerto Rico. Under these circumstances, the First Circuit found that the district court's exercise of jurisdiction over the Brazilian defendant was proper under all three of the stream-of-commerce views expressed in Asahi. Applying the O'Connor view, the court specifically found that the defendant's arrangements with the sales representative constituted a "deliberate marketing effort" directed at the forum. Benitez-Allende, supra, 857 F.2d at 29-30. This "additional conduct" was sufficient to find that the defendant had purposely availed itself of the privilege of doing business in Puerto Rico.

In Boit, the plaintiffs suffered damage to their home when a

14

hot air gun purchased to strip paint caused material in the exterior walls of their home to ignite. The hot air gun was a product the defendant had imported from Germany and redistributed under its own label. The plaintiffs had purchased the hot air gun by mail from Brookstone, a national mail order business. Applying the O'Connor view from Asahi and its own decision in Hughes, the First Circuit found that, assuming the defendant had sold the hot air gun directly to Brookstone, such conduct, followed by Brookstone's sale of the gun by mail to the plaintiff in Maine, was not, without more, an act purposely directed toward Maine. Boit, supra, 967 F.2d at 681-83.

The court finds that the instant case falls somewhere between the factual circumstances which supported a finding of personal jurisdiction in Benitez-Allende and those circumstances which did not support such a finding in Hughes and Boit.

Here, the evidence reveals that Vanguard manufactured the leather protectant product in question exclusively for Wilsons. When the chemical formula for the product needed to be reformulated due to EPA regulations, Vanguard developed a new chemical formula for the leather protectant, manufactured the product, packaged the product in 5-ounce aerosol containers with a "Wilsons Leather Protector" label,[4] and shipped the product to

_____

[4]Vanguard's name does not appear on the label.

15

Wilsons' distribution warehouses in Minnesota and California.

From there, Wilsons distributed the leather protectant to its nationwide chain of approximately 550 retail stores, which included several stores in New Hampshire. Vanguard Vice President Barry Feldman testified in a March 2, 1995, deposition that he knew Wilsons had "around 450 stores," but he "never asked them if they sold [the leather protectant] in all stores." Deposition of Barry Craig Feldman at 48 (attached to Plaintiff's Reply Memorandum).

Feldman further states in his affidavit that

> [o]nce Vangard sold goods to Wilsons, it retained no control or input into the distribution of such goods. Specifically, with regard to any goods shipped to Wilsons' Minnesota or California warehouses, Wilsons marketed the goods under its own private label, determined where, when and on what terms the goods were sold, and sold the goods from its stores or local affiliates.

Feldman Affidavit ¶ 12.

The court finds that Vanguard, by entering into an agreement whereby it manufactured the leather protectant in question exclusively for Wilsons and packaged that product in aerosol cans with the "Wilsons" label on them, knew or should have known that the product was to be sold in Wilsons' nationwide chain of stores, including its stores in New Hampshire.

Further, in 1992 Feldman initiated an advertising and

16

promotional program for the new leather protectant Vanguard was manufacturing for Wilsons.  The program was described as follows in a facsimile sent from Feldman to Mr. Randy Steen at Wilsons:

> Randy, in appreciation of all of the people you have told us about and who are hopefully going to generate quite a bit of business for us, I am going to start a new program for your division to be used for contests as follows:
> Once we are in the new isoctane formula in 1993, in the new necked in can, shipping you only trailer size loads, I will allow you to make a charge back once a year to be used for promotion of products made by our firm, of 1% of your purchases from us in the new formula.
> As an example, based on 2,000,000 cans per year, at .83 per can freight prepaid, you would be able to take a charge back from us of $16,660.00 to use for contests.
> The more you buy from us, the more you will have to use for promoting the products.

Fax transmission from Barry Feldman to Randy Steen dated June 4, 1992 (attached to Plaintiff's Reply Memorandum as Exhibit 5). This program was clearly intended to promote the leather protectant in the forums where Wilsons did business for the benefit of both Wilsons and Vanguard.

The evidence presented clearly shows that Vanguard had no direct contact with New Hampshire.  However, the court finds that Vanguard has done more than "the mere act of placing the product into the stream" of commerce.  Asahi, supra, 480 U.S. at 112 (O'Connor, J., plurality).

Vanguard developed and produced the leather protectant in

17

question exclusively for Wilsons with the knowledge that Wilsons would be distributing and marketing the product through its nationwide chain of stores. That Vanguard benefitted from Wilsons' nationwide distribution of the product is evident from the fact that Vanguard manufactured approximately two to three million cans of the original leather protectant between 1989 and 1992, and approximately 440,000 of the reformulated leather protectant in November and December of 1992. Wilsons estimates that approximately 350,000 cans of the newly formulated product were sold to consumers before the recall was issued. Wilsons' sales records further show that over 10,000 cans of the leather protectant were sold in New Hampshire during November and December 1992 alone.

Vanguard was pleased with the business generated by Wilsons and in an effort to encourage and increase sales of the new formula, Vanguard initiated the promotional program described herein. The court finds that this promotional scheme evinces an intent on Vanguard's part to serve and expand the markets in which Wilsons operated its retail stores.

Given the exclusive and ongoing nature of the relationship between Vanguard and Wilsons, and the volume of Wilsons' sales of the leather protectant in New Hampshire, the court finds that Vanguard has made an effort, albeit an indirect one, to serve the

18

market in New Hampshire for its leather protectant product.  See

2A LOUIS R. FRUMER & MELVIN I. FRIEDMAN, PRODUCTS LIABILITY § 16.04,

at 16-25 (minimum contacts required to support the exercise of

personal jurisdiction are present if a seller of a product

"engage[s] in a distribution network that is, directly or

indirectly, calculated to reach or serve a market for the product

in the forum state.").  The court further finds that Vanguard's

contacts with this forum were more than an isolated occurrence

and that the sale of over 10,000 cans of Wilsons Leather

Protectant in New Hampshire was more than "an isolated splash."

Hughes, supra, 781 F.2d at 15.  Consequently, under the stream-

of-commerce plus additional conduct test from both Asahi and

Hughes, the court finds that plaintiff has made a prima facie

showing that Vanguard purposely availed itself of the privilege

of doing business in New Hampshire.


(3) The Gestalt Factors

The factors considered and weighed in the First Circuit to

ensure that the maintenance of a suit does not offend traditional

notions of fair play and substantial justice include:

> "(1) the defendant's burden of appearing, (2)
> the forum state's interest in adjudicating
> the dispute, (3) the plaintiff's interest in
> obtaining convenient and effective relief,
> (4) the judicial system's interest in
> obtaining the most effective resolution of

19

> the controversy, and (5) the common interests
> of all sovereigns in promoting substantive
> social policies."

Pritzker, supra, 42 F.3d at 63-64 (quoting Pleasant Street I,

supra, 960 F.2d at 1088).

Here, the court finds that Vanguard's burden of appearing in New Hampshire, though not insignificant, does not outweigh New Hampshire's interest in adjudicating this suit. See Ticketmaster, supra, 26 F.3d at 211 ("The forum state has a demonstrable interest in exercising jurisdiction over one who causes tortious injury within its borders."). In so finding, the court notes that advances in communications technology and transportation which have contributed to the nationalization of commerce have also "made the defense of a suit in a foreign tribunal less burdensome." World-Wide Volkswagen, supra, 444 U.S. at 294 (citing Hanson v. Denckla, 357 U.S. 235, 251 (1958)). See also Pritzker, supra, 42 F.3d at 64 ("the concept of burden is inherently relative, and, insofar as staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly, we think this factor is only meaningful where a party can demonstrate some kind of special or unusual burden").

Plaintiff purchased the leather protectant and was injured while using the product in New Hampshire. Although plaintiff no longer resides in New Hampshire, his choice of forum is still

20

entitled to some deference. E.g., Foster-Miller, supra, 46 F.3d at 151 ("courts considering jurisdictional issues generally should 'accord plaintiff's choice of forum a degree of deference in respect to the issue of its own convenience'") (quoting Ticketmaster, supra, 26 F.3d at 211).

Finally, the court finds that the administration of justice and the interests of all sovereigns favor allowing an injured party to obtain relief from all parties responsible for his injuries in a single forum, so long as the court's exercise of jurisdiction over said parties does not otherwise offend due process. See, e.g., Pritzker, supra, 42 F.3d at 64 ("the judicial system's interest in obtaining the most efficacious resolution of the controversy . . . counsels against furcation of the dispute among several different jurisdictions").

On balance, the court finds that its exercise of jurisdiction over defendant Vanguard does not offend traditional notions of fair play and substantial justice. The court therefore finds that plaintiff has made his prima facie burden of showing that jurisdiction over Vanguard exists.

## Conclusion

For the reasons set for herein, defendant's motion to dismiss (document 8) is denied.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

May 2, 1995

cc:  Robert L. Elliott, Esq.
     Wilbur A. Glahn III, Esq.
     Charles Platto, Esq.
     J. Powell Carman, Esq.
     Marc R. Scheer, Esq.
     Eugene W. Brees II, Esq.

22