USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 96-2122 SETH BERNER, Plaintiff, Appellant, v. JUDGE THOMAS E. DELAHANTY, II, Defendant, Appellee. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene Carter, U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Aldrich and Campbell, Senior Circuit Judges. _____________________ _________________________ Seth Berner, pro se. ___________ Peter J. Brann, Assistant Attorney General, with whom Andrew ______________ ______ Ketterer, Attorney General, and Thomas D. Warren, State ________ ___________________ Solicitor, were on brief, for appellee. _________________________ October 28, 1997 _________________________ SELYA, Circuit Judge. Attorney Seth Berner claims SELYA, Circuit Judge. ______________ that lawyers have an absolute right, protected by the First Amendment, to wear political buttons in the courtroom as long as the buttons do not disrupt judicial proceedings. We reject that proposition and affirm the district court's dismissal of Berner's action for declaratory and injunctive relief. I. BACKGROUND I. BACKGROUND The facts, drawn from the plaintiff's verified complaint and construed in his favor, see Dartmouth Review v. ___ _________________ Dartmouth College, 889 F.2d 13, 16 (1st Cir. 1989), can be __________________ recounted readily. The defendant, Thomas E. Delahanty, II, is an associate justice of the Maine Superior Court. On October 31, 1995, Berner was seated in the gallery of Judge Delahanty's courtroom, waiting for his turn to appear before the court. Berner wore a circular button pinned to his lapel. The button was approximately two inches in diameter and bore the words "No "No on 1 - Maine Won't Discriminate." This legend expressed on 1 - Maine Won't Discriminate." opposition to a statewide referendum that Maine voters were scheduled to consider during the November election.1 Neither the pin nor its message were related to Berner's business before the court. At some point during the day's proceedings, Judge Delahanty called Berner to the bench. The following exchange took place:  ____________________ 1The referendum sought to prohibit the passage of laws that condemned discrimination on the basis of sexual orientation. It had been the subject of heated debate. 2 THE COURT: Mr. Berner . . . Can you remove THE COURT: _________ the political pen [sic] while you're in the courtroom? ATTORNEY BERNER: Your Honor, what happened ATTORNEY BERNER: _______________ to my right to political speech? THE COURT: Not in the courtroom. We don't THE COURT: _________ take sides. ATTORNEY BERNER: I want the record to ATTORNEY BERNER: ________________ reflect that I don't think there's any authority for that. THE COURT: The courtroom is not that may THE COURT: _________ be, but the courtroom is not a political forum. ATTORNEY BERNER: Your honor, I want the ATTORNEY BERNER ________________ record to reflect that I object to that. Reasonably believing that he would be held in contempt if he did not comply with the court's order, Berner removed the button. During a chambers conference later that day, the judge told Berner that he planned to perpetuate the prohibition against lawyers wearing political buttons in his courtroom unless and until he was overruled by a higher authority. Berner took refuge in the United States District Court, where he sought declaratory and injunctive relief pursuant to 42 U.S.C. 1983 (1994). His rifle-shot complaint contained a single claim: that the button ban violated the First Amendment. In support of this claim Berner alleged that his button had not caused any disruption of the ongoing proceedings and that Judge Delahanty "routinely permitted the wearing in his courtroom of other ornamentation supporting causes, such as crucifixes and insignia for armed forces or fraternal orders." A flurry of motions ensued. The district court denied 3 Berner's motion for a preliminary injunction, finding an insufficient likelihood of success on the merits. The court then addressed the defendant's motions to dismiss the action for lack of standing and failure to state an actionable claim. The court finessed the former by assuming, without deciding, that Berner had standing to sue. See Berner v. Delahanty, 937 F. Supp. 62, ___ ______ _________ 62 (D. Me. 1996). Turning to the legal sufficiency of the complaint, the court held that the controlling legal standard was the forum- specific analysis of Cornelius v. NAACP Legal Defense and Educ. _________ ______________________________ Fund, Inc., 473 U.S. 788, 800 (1985) (discussing varying levels ___________ of scrutiny applicable to governmental restrictions on speech in different fora). See Berner, 937 F. Supp. at 63. Because the ___ ______ parties "agree[d] that the state courtroom is a nonpublic forum," Judge Carter found, consistent with Cornelius, that the decision _________ to limit the wearing of political buttons "need only be: (1) reasonable in light of the purpose which the court serves and (2) viewpoint neutral." Id. Building on this premise, the judge ___ concluded that the restriction on political paraphernalia was a reasonable attempt to "shield the courtroom from the inevitable appearance of politicization," and that there was "no indication that [Judge Delahanty] intended to discourage one viewpoint and advance another." Id. Since he perceived the button ban to be a ___ "reasonable viewpoint-neutral restriction," Judge Carter ruled that the complaint stated no claim upon which relief could be granted. Id. ___ 4 On appeal, Berner assails the district court's analysis. He maintains that the court placed undue emphasis on Cornelius; that it erred in gauging the reasonableness of the _________ ban; and, finally, that it failed to give appropriate weight to the defendant's tolerance of persons wearing other politically- tinged ornamentation. II. SCOPE OF REVIEW II. SCOPE OF REVIEW We evaluate de novo a district court's dismissal of an action for failure to state a cognizable claim. See Aulson v. ___ ______ Blanchard, 83 F.3d 1, 3 (1st Cir. 1996). In assaying such a _________ dismissal, the appellate court, like the court that preceded it, must assume that the factual averments of the complaint are true and must draw all plausible inferences in the plaintiff's favor. See Leatherman v. Tarrant Cty. Narcotics Intell. & Coord. Unit, ___ __________ ______________________________________________ 507 U.S. 163, 164 (1993); Dartmouth Review, 889 F.2d at 16. ________________ In this case, the district court gracefully sidestepped the standing inquiry, preferring instead a pas de deux directly ____________ with the merits of the complaint. While we recognize the occasional availability of such a terpsichorean course, see, ___ e.g., United States v. Stoller, 78 F.3d 710, 715 (1st Cir. 1996) ____ _____________ _______ (explaining that a court may bypass a difficult jurisdictional question and instead dispose of the case on the merits if doing so favors the party challenging the court's jurisdiction); see ___ also Rojas v. Fitch, ___ F.3d ___, ___ (1st Cir. 1997) [No. 96- ____ _____ _____ 2328, slip op. at 7] (employing Stoller principle to sidestep an _______ inquiry into standing), in this appellate lambada we are 5 reluctant to follow suit. Standing is a threshold issue in every federal case and goes directly to a court's power to entertain an action. See Warth v. Seldin, 422 U.S. 490, 498 (1975); New ___ _____ ______ ___ Hampshire Right to Life Political Action Comm. v. Gardner, 99 _________________________________________________ _______ F.3d 8, 12 (1st Cir. 1996). Moreover, the general rule is that a court should first confirm the existence of rudiments such as jurisdiction and standing before tackling the merits of a controverted case. The exception discussed in Stoller is exactly _______ that an exception, which, in light of the danger that an ensuing decision on the merits might be rendered sterile by the tribunal's lack of authority to resolve the case, should be used sparingly. Resort should not be made to the exception where, as here, no substantial doubt attaches to the threshold issue. Hence, we choose to confront and resolve the standing question before proceeding to the merits.2 III. STANDING III. STANDING The criteria for standing are well-rehearsed. To establish that a dispute qualifies as an Article III "case" or "controversy," enabling it to obtain a federal court audience,  ____________________ 2Shortly after the district court dismissed Berner's suit, Congress amended 42 U.S.C. 1983 to provide "that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." Pub. L. 104-317, 309(c), 110 Stat. 3853 (1996). Judge Delahanty presumably because Berner's complaint seeks declaratory as well as injunctive redress neither moved for dismissal of the appeal nor raised the amendment as an alternate ground for affirming the judgment. Under the circumstances, it would serve no useful purpose for us to set sail, uninvited, on these uncharted waters. 6 the party seeking to invoke federal jurisdiction must first demonstrate that  (1) he or she personally has suffered some actual or threatened injury as a result of the challenged conduct; (2) the injury can fairly be traced to that conduct; and (3) the injury likely will be redressed by a favorable decision from the court. New Hampshire Right to Life, 99 F.3d at 13. We hasten to add, ____________________________ however, that the Court has placed a special gloss on cases in which a party seeks exclusively injunctive or declaratory relief. In such purlieus, standing inheres only if the complainant can show that he has suffered (or has been threatened with) "an invasion of a legally protected interest which is . . . concrete and particularized," Lujan v. Defenders of Wildlife, 504 U.S. _____ ______________________ 555, 560 (1992), together with "a sufficient likelihood that he will again be wronged in a similar way," City of Los Angeles v. ___________________ Lyons, 461 U.S. 95, 111 (1983). In other words, the complainant _____ must establish that the feared harm is "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 460 (citations _____ and internal quotation marks omitted). It bears noting that the imminence concept, while admittedly far reaching, is bounded by its Article III purpose: "to ensure that the alleged injury is not too speculative." Id. at 564 n.2. ___ In addition to these benchmarks of constitutional sufficiency, standing doctrine "also embraces prudential concerns regarding the proper exercise of federal jurisdiction." United ______ States v. AVX Corp., 962 F.2d 108, 114 (1st Cir. 1992). Under ______ __________ this rubric, courts generally insist that every complainant's tub 7 rest on its own bottom. See id. (stating that a plaintiff ___ ___ ordinarily cannot sue to assert the rights of third parties). When the First Amendment is in play, however, the Court has relaxed the prudential limitations on standing to ameliorate the risk of washing away free speech protections. See Secretary of ___ ____________ State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 956 (1984). ____________ ____________________ Hence, when freedom of expression is at stake: Litigants . . . are permitted to challenge a [policy] not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the [policy's] very existence may cause others not before the court to refrain from constitutionally protected speech or expression. Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973). _________ ________ Against this backdrop, Judge Delahanty strives to persuade us that, even if Berner has standing to challenge the button ban as a past violation of his First Amendment rights (say, by a suit for money damages), he has no standing to seek declaratory and injunctive relief because there is no reasonable likelihood that he will again face similar harm. We are not convinced. Berner is a member of the Maine bar and a full-time practicing lawyer who regularly handles litigation. Born in 1956, much of his career apparently lies ahead of him. Moreover, Maine is not California. The superior court is the principal statewide court of general jurisdiction, see Me. Rev. Stat. Ann. ___ tit. 4, 105 (West 1989), and its business is handled by a total of only 16 active judges. The law of averages strongly suggests 8 that vocational demands will bring Berner before each and all of these judges in the months and years to come. To cinch matters, the parties remain philosophically on a collision course. Berner's passion for political pins has not waned, and he has vowed that, when once again afforded the opportunity, he would not hesitate, but for Judge Delahanty's stated policy, to wear a political button in the jurist's courtroom. The judge, too, remains steadfast in his determination to prohibit attorneys from sporting such pins in his bailiwick. On balance, the combination of facts reflected by the record persuades us that Berner faces a realistic risk of future exposure to the challenged policy. Such a risk is sufficient to satisfy not only the standing requirements that Article III imposes, but also the prudential concerns that sometimes trouble courts. See DuBois v. United States Dep't of Agric., 102 F.3d ___ ______ ______________________________ 1273, 1283 (1st Cir. 1996); see also American Postal Workers v. ___ ____ ________________________ Frank, 968 F.2d 1373, 1377 (1st Cir. 1992) (elucidating doctrinal _____ parameters of Lyons). _____ In any event, Berner alleges that the button ban constitutes a threat not only to his own right to political speech but also to the rights of "other citizens." Thus, even if these particular parties' paths were not likely to cross again, Berner might well be able to invoke the federal courts' jurisdiction to seek equitable relief based on the "judicial prediction" that the policy may chill the general exercise of 9 free speech. Broadrick, 413 U.S. at 612. Judge Delahanty's _________ prohibition apparently applies to every court officer, and we are not so struthious as to hide our eyes from the probability that, as a result of such a policy, other attorneys will refrain from expressing opinions by wearing political paraphernalia when appearing before this judge. In itself, this can be a sufficiently concrete and particularized injury to First Amendment protections to ground a claim of standing. See ___ Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 392- ________ ________________________________ 93 (1988). IV. THE MERITS IV. THE MERITS In attempting to ascertain whether the district court erred in granting the defendant's motion to dismiss the action for failure to state a claim, Fed. R. Civ. P. 12(b)(6), we must assume that the complaint's factual averments are true and determine from that coign of vantage whether the pleading encompasses any set of facts that would entitle the plaintiff to relief. See Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, ___ _______________ __________________ 52 (1st Cir. 1990) (explaining that an affirmance of a Rule 12(b)(6) dismissal is appropriate "only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory"). Although this standard is diaphanous, it is not a virtual mirage. To survive a motion to dismiss, a complaint must set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gooley v. ______ 10 Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988). It is, ________________ moreover, settled that in judging the adequacy of a plaintiff's allegations, "bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, [and] outright vituperation" carry no weight. Correa-Martinez, 903 F.2d at 52. _______________ These rules of pleading and practice cannot be applied in a vacuum. Thus, to evaluate properly the sufficiency of Berner's complaint, we first construct a template that comprises the averments necessary to state a claim for violation of the First Amendment in this context. We then proceed to measure the facts that Berner alleges in his complaint3 against this template to ascertain whether those facts, if proven, suffice to establish an entitlement to relief. A. The First Amendment Framework. A. The First Amendment Framework. _____________________________ It is axiomatic that not every limitation on freedom of expression insults the First Amendment. A curtailment of speech violates the Free Speech Clause only if the restricted expression is, in fact, constitutionally protected, see Chaplinsky v. New ___ __________ ___ Hampshire, 315 U.S. 568, 571-72 (1942), and if the government's _________ justification for the restriction is inadequate, see ___  ____________________ 3Rule 12(b)(6) provides in pertinent part that if, on a motion to dismiss, "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Here, the parties submitted affidavits subsequent to the filing of the complaint, but the district court apparently did not rest its decision in any way on these materials (and, thus, effectively excluded them). This course of action lay within the court's discretion, see Garita Hotel Ltd. Partnership, Etc. v. ___ _____________________________________ Ponce Fed. Bank, 958 F.2d 15, 18-19 (1st Cir. 1992), and we guide _______________ our analysis accordingly. 11 International Soc'y for Krishna Consciousness v. Lee, 505 U.S. _______________________________________________ ___ 672, 678 (1992).4 In Cornelius, the Court articulated a three-tiered, _________ forum-based test for determining when the government's interest in limiting particular property to its intended purpose outweighs the interests of those who wish to use the property for expressive purposes: [S]peakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. Similarly, when the Government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest. Access to a nonpublic forum, however, can be restricted as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view. Cornelius, 473 U.S. at 800 (citations and internal quotation _________ marks omitted); accord Perry Educ. Ass'n v. Perry Local ______ ___________________ ____________ Educators' Ass'n, 460 U.S. 37, 45-46 (1983). Thus, when a _________________ plaintiff seeks to launch a First Amendment challenge addressed to a policy or practice that restricts expressive activity on public property, he must plead facts sufficient to show (1) that the government has burdened a protected form of speech, and (2) that the restriction is unreasonable (which, in a nonpublic  ____________________ 4The adequacy of the government's justification is measured on a sliding scale. Generally speaking, the nature of the forum in which the speech is restricted dictates the level of scrutiny required. See International Soc'y for Krishna Consciousness, 505 ___ _____________________________________________ U.S. at 678-79; United States v. Kokinda, 497 U.S. 720, 726-27 _____________ _______ (1990). 12 forum, may involve showing that the restriction is biased, and, in public or limited public fora, may involve showing that it is not narrowly drawn to further a compelling state interest). The appeal before us arises in a slightly awkward posture. Ordinarily, a complaint, standing alone, will not provide a suitable vehicle for evaluating the adequacy of the government's justification for restricting speech. In some instances, however, the government's rationale is either clearly stated in the restriction itself or plain from even a cursory examination of the restriction. If the justification is apparent and is plausible on its face, a complainant who hopes to survive a motion to dismiss must do more than suggest conclusorily that the state has an improper or insufficient motivation. Rather, the complainant must allege facts that, if proven, would support, directly or by fair inference, a finding that the state's justification falls short of the applicable legal standard. B. The Sufficiency of the Complaint. B. The Sufficiency of the Complaint. ________________________________ We turn now to the sufficiency of the instant complaint. As to the nature of the speech, we conclude that the complaint adequately alleges infringement of a constitutionally protected form of expression the plaintiff's right to advocate a particular political position by wearing an emblem. See Board ___ _____ of Airport Commissioners v. Jews for Jesus, 482 U.S. 569, 576 _________________________ ______________ (1987); Tinker v. Des Moines Indep. Community School Dist., 393 ______ __________________________________________ U.S. 503, 505 (1969). Such political expression is typical of the broad spectrum of symbolic acts that the Free Speech Clause 13 of the First Amendment is designed to protect. Berner does not fare as well when the spotlight shifts to the apparent justification for the restriction. A courthouse and, especially, a courtroom is a nonpublic forum. See ___ United States v. Bader, 698 F.2d 553, 556 (1st Cir. 1983); ______________ _____ Claudio v. United States, 836 F. Supp. 1219, 1224-25 (E.D.N.C. _______ ______________ 1993), aff'd, 28 F.3d 1208 (4th Cir. 1994). A courtroom's very _____ function is to provide a locus in which civil and criminal disputes can be adjudicated. Within this staid environment, the presiding judge is charged with the responsibility of maintaining proper order and decorum. In carrying out this responsibility, the judge must ensure "that [the] courthouse is a place in which rational reflection and disinterested judgment will not be disrupted." Ryan v. County of DuPage, 45 F.3d 1090, 1095 (7th ____ _________________ Cir. 1995). We think it is beyond serious question that the proper discharge of these responsibilities includes the right (and, indeed, the duty) to limit, to the extent practicable, the appearance of favoritism in judicial proceedings, and particularly, the appearance of political partiality. Cf. Greer ___ _____ v. Spock, 424 U.S. 828, 839 (1976) (finding that a ban on _____ political speeches and demonstrations on military bases "is wholly consistent with the American constitutional tradition of a politically neutral military establishment under civilian control"). Judge Delahanty's order compelling Berner to remove his political-advocacy button while in the courtroom fits comfortably 14 within this apolitical paradigm. Emblems of political significance worn by attorneys in the courtroom as a means of espousing personal political opinions can reasonably be thought to compromise the environment of impartiality and fairness to which every jurist aspires. As an officer of the court, a lawyer's injection of private political viewpoints into the courtroom, coupled with the judge's toleration of such conduct, necessarily tarnishes the veneer of political imperviousness that ideally should cloak a courtroom, especially when the partisan sentiments are completely unrelated to the court's business. Here, Judge Delahanty stated clearly that he was ordering Berner to remove the button because participants in the judicial process ought not simultaneously "take sides" in extraneous political debates.5 This explanation is entirely consistent with a desire to ensure that the courtroom remains free from the appearance of political partisanship. Evaluating the professed justification, as we must, "in light of the purpose of the forum and all the surrounding circumstances," Cornelius, _________ 473 U.S. at 809, we discern no reason why a judge may not even- handedly prohibit lawyers from wearing political paraphernalia in the courtroom. Berner labors mightily to supply such a reason. Most notably, he asseverates that, regardless of the form and function of the courtroom, it is unreasonable to prohibit political pins  ____________________ 5We consider Judge Delahanty's statements only insofar as they are reflected in the transcript appended to and incorporated by reference in the plaintiff's complaint. 15 that do not have the effect of disrupting judicial proceedings. As support for this thesis, he directs us to the Court's opinion in Jews for Jesus. He emphasizes that the Justices there _______________ invalidated a ban which, among other things, proscribed "nondisruptive speech such as the wearing of a T-shirt or button that contains a political message." 482 U.S. at 576. Berner's reliance on Jews for Jesus is mislaid. ______________ That case involved an overbreadth challenge to a municipal ordinance which, on its face, "reache[d] the universe of expressive activity, and, by prohibiting all protected ___ expression, purport[ed] to create a virtual `First Amendment Free Zone' at [a major airport]." Id. at 575. Not surprisingly, the ___ Court held that, even if an airport is a nonpublic forum, no government interest could justify excluding all forms of ___ protected expression from that locale. See id. The prohibition ___ ___ here is hardly of such unbridled scope, and, in all events, the plaintiff has not attacked it as overbroad or vague. In addition, an airport terminal, in which free expression presumably would have been allowed absent the challenged ordinance, differs substantially from a courtroom, in which "whatever right to `free speech' an attorney has is [already] extremely circumscribed." Gentile v. State Bar of Nevada, 501 _______ ____________________ U.S. 1030, 1071 (1991). For these reasons, Jews for Jesus is _______________ inapposite. Stripping away the authority on which Berner relies still leaves intact his bareboned contention that it is 16 unreasonable to restrict non-disruptive speech. As applied to courtrooms, we think that this view is much too myopic. In the first place, the danger of disturbing a court's proceedings is only one acceptable justification for restricting protected speech. There are others. So here: even though Berner's button caused no commotion, his mere wearing of a pin that advocates a position regarding a hotly contested political issue raises the specter of politicalization and partiality. Mindful of the purposes of the courtroom and Berner's role as an officer of the court, we conclude that it was reasonable for the judge to bar Berner's political statement regardless of whether it created a stir. See Cornelius, 473 U.S. at 809 (finding that ___ _________ "avoiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum"). There is, moreover, a broader justification. By their nature, courtrooms demand intense concentration on important matters. Whether or not disruptive, buttons that display political messages are at the very least distracting. Lawyers who wear such emblems serve not only as vocal advocates for their clients in matters before the court, but also as active promoters of their own political agendas. If a presiding judge turns a blind eye to attorneys' espousals of political sentiments unrelated to ongoing proceedings, clarity and continuity may well suffer. Hence, judges may take reasonable prophylactic measures to minimize such distractions. As a fallback position, Berner maintains that Judge 17 Delahanty's policy is not viewpoint neutral because the defendant banned his button despite having allowed other emblems in the courtroom, and that this lack of neutrality violates the First Amendment. We disagree. The essence of viewpoint-based discrimination is the state's decision to pick and choose among similarly situated speakers in order to advance or suppress a particular ideology or outlook. See Lamb's Chapel v. Center ___ _____________ ______ Moriches Union Free Sch. Dist., 508 U.S. 384, 393-94 (1993); ________________________________ Cornelius, 473 U.S. at 806. Although the Free Speech Clause may _________ not prevent government officials from restricting an entire category of speech based on its content, it does preclude such officials from selectively granting safe passage to speech of which they approve while curbing speech of which they disapprove. See, e.g., Burnham v. Ianni, 119 F.3d 668, 676 (8th Cir. 1997); ___ ____ _______ _____ Gay Lesbian Bisexual Alliance v. Pryor, 110 F.3d 1543, 1549 (11th _____________________________ _____ Cir. 1997). This requirement of viewpoint neutrality prohibits the state both "from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction," Rosenberger v. Rector & Visitors ___________ _________________ of the Univ. of Va., 515 U.S. 819, 829 (1995), and from treating ___________________ differently comparable means of expression when the nature of the speech is the linchpin of the limitation, see AIDS Action Comm. ___ _________________ of Mass., Inc. v. Mass. Bay Transp. Auth., 42 F.3d 1, 9-12 (1st ______________ _______________________ 18 Cir. 1994).6 This case does not implicate either of these iterations. There is simply no basis in the complaint for an inference that ideology sparked the button ban. The closest that the complaint comes is an averment that, despite outlawing Berner's pin, the "[d]efendant has routinely permitted the wearing in his courtroom of other ornamentation supporting causes, such as crucifixes and insignia for armed forces or fraternal orders." Taken as true, this averment is not sufficient to sustain a claim of viewpoint discrimination because Berner does not allege that the banishment of his political pin had anything to do with the message emblazoned on his button or that the causes promoted by the permitted symbols bear an ideological relation to his own button-backed political viewpoint such that allowing these other emblems in the courtroom but excluding his pin rationally may be seen as a discriminatory attempt to stifle his opinion. Nor can the plaintiff convincingly mount a claim of  ____________________ 6In AIDS Action Committee, the defendant, a state agency, _____________________ refused to allow the plaintiff to post public service announcements that used "sexual innuendo and double entendre to communicate its message" anent the use of condoms "while simultaneously permitting other advertisers to communicate their messages through these modes of expression." 42 F.3d at 10. The panel compared the permitted and prohibited advertisements, focusing particularly on whether they displayed sexual images at equivalent levels of explicitness, and concluded that the two sets of advertisements were equally suggestive. The panel then ruled that the defendant's differential treatment of similarly suggestive advertisements constituted "content discrimination which gives rise to the appearance of viewpoint discrimination" in violation of the First Amendment. Id. at 11. ___ 19 viewpoint bias based on the prohibition of his political speech in the courtroom without a corresponding disallowance of military and religious ornamentation (which, in his view, also advance political causes). The lesson of AIDS Action Committee is that ______________________ an inference of viewpoint discrimination sometimes can be drawn when the proscribed speech and the permitted speech are alike in ways that undermine the justification asserted in support of the restriction. Here, however, the stated justification is to avoid the appearance of political partiality, and Berner's allegations do not in any way impeach that justification. No substantial equivalency exists between political buttons, on the one hand, and military and religious emblems, on the second hand. A political button has only a single purpose: to express a view on a political candidate or cause. In contrast, military and religious symbols, standing alone, do not expressly advocate a particular political position, and, at best, are subject only to secondary political connotations. Such adornments have multiple meanings, including but not limited to conveying allegiance to a particular institution or a broad band of convictions, values, and beliefs. Thus, because restraining partisan expression in the neutral environ of a courtroom is a legitimate goal, a judge reasonably may decide to prohibit pins that primarily and expressly champion specific political stances and at the same time permit the wearing of military and religious accessories.7  ____________________ 7This case does not require us to address the question of whether, and if so, under what circumstances, a judge has the power to exclude military and religious insignia. We leave that 20 In the circumstances of this case, the decision not to bar such tokens does not compromise the propriety of an otherwise permissible prohibition precluding political paraphernalia. To say more would be supererogatory. Based on the allegations of the plaintiff's complaint, no inference of viewpoint bias reasonably can be drawn. V. CONCLUSION V. CONCLUSION We need go no further.8 An attorney is free, like all Americans, to hold political sentiments. In a courtroom setting, however, lawyers have no absolute right to wear such feelings on their sleeves (or lapels, for that matter). Judge Delahanty's policy of prohibiting all political pins is a reasonable means of ensuring the appearance of fairness and impartiality in the courtroom, and the plaintiff has made no supportable allegation that the restriction is viewpoint based. Consequently, Berner's  ____________________ question for another day. 8In this venue, Berner argues, for the first time, that Cornelius does not supply the appropriate legal guidepost for _________ this case. In Berner's newly-emergent view, Cornelius should be _________ read to affect limitations on access to public or nonpublic fora, but not to affect limitations on speech. Although we are tempted to hold explicitly that this access/speech dichotomy is made up out of whole cloth, we take a simpler route. In the district court, Berner acknowledged Cornelius's suzerainty and conceded _________ relevant and substantial portions of the ensuing analysis. Consequently, he has forfeited his right to argue a new, much different theory on appeal. See McCoy v. Massachusetts Inst. of ___ _____ ______________________ Tech., 950 F.2d 13, 16 (1st Cir. 1991); Clauson v. Smith, 823 _____ _______ _____ F.2d 660, 666 (1st Cir. 1987). 21 complaint fails to state a claim upon which relief can be granted. Affirmed. Affirmed. ________ 22