**Susan FORD and Dennis Ford, Plaintiffs,**

v.

**NATIONWIDE MUTUAL FIRE INSURANCE COMPANY, Defendant.**

**No. CIV. 01–133–P–H.**

United States District Court, D. Maine.

Aug. 1, 2002.

---

Terrence Garmey, Sarah Kent Hall, Smith, Elliott, Smith & Garmey, PA, Portland, ME, for Susan Ford and Dennis Ford.

Daniel R. Mawhinney, Elizabeth Knox Peck, Thompson & Bowie, Portland, ME, for Nationwide Mutual Fire Insurance Company.

## ORDER ON PLAINTIFFS' MOTION FOR A NEW TRIAL

HORNBY, Chief Judge.

The issues on this Rule 59 motion for new trial are whether I:(1) improperly forced a stipulation of damages upon the plaintiffs; (2) improperly allowed the defendant's accident reconstruction expert to testify; or (3) improperly declined to order the same witness to remove an American flag pin from his lapel. The plaintiffs' motion for new trial is DENIED.

### BACKGROUND

The testimony at trial revealed that Susan Ford and her two sisters were heading for the airport in Las Vegas in the pre-

dawn hours of March 6, 2000, to catch a plane to Phoenix. Susan Ford was driving their rental car. They engaged a cab at their hotel to accompany them so that they would have the cab available to drive them to the airport when they reached the drop-off location for their rental car. One sister, Paula Koveleski, went with the cab driver, but Susan Ford led the procession with her other sister, Shirley Pole, in the back seat. Eventually Susan Ford got lost. The cab driver signaled Susan Ford to pull over to the side of Tropicana Avenue, eastbound, and stop. She did, and the cab driver told her that he would lead the way to the drop off. He then reversed direction on Tropicana Avenue (just how he did so is disputed) and Susan Ford also attempted to reverse direction from her parked location on the right hand side of this 8–lane road. As she was crossing the second lane of eastbound traffic on Tropicana Avenue at a right angle, she was hit broadside by an eastbound pickup truck driven by Kevin Lawrence.

Because of the injuries she suffered, Susan Ford has no memory of what she did that led to the collision. Shirley Pole, the passenger in Susan Ford's vehicle, did not testify at the trial. The cab driver told the police at the scene and later testified that he saw the accident in his rearview mirror.[1] In October of 2001, he stated for the first time that Kevin Lawrence's headlights were off. Dep. of Alvin D. Reekie at 76–77. Paula Koveleski did not see the collision occur (she was in the back seat of the cab heading away west on Tropicana), but heard it; she could not testify whether the lights of the truck were on. Tr. of Test. of Paula Koveleski at 15. Kevin Lawrence testified that his headlights were on, but the jury also learned that he was arrested at the scene for drunk driving and that his blood alcohol content was 0.115, above Nevada's legal limit. The only other witness, another driver (Michelle Gurney) heading westbound on Tropicana, saw the collision but made no mention to the police that the truck lights were off.[2]

After obtaining the policy benefits of Kevin Lawrence's insurance policy by way of settlement, Susan Ford sued her own insurance company for underinsured motorist benefits, since Kevin Lawrence's $15,000 of coverage came nowhere near meeting the injuries she had suffered in this near-fatal collision. Her husband, Dennis Ford, joined her, seeking compensation for loss of consortium. The issue at trial was whose negligence was the primary cause of the collision: Susan Ford's or Kevin Lawrence's. In a special verdict, the jury found that both drivers were negligent, but that Susan Ford was more negligent, thus barring the plaintiffs' recovery.

### DAMAGES STIPULATION

■ The plaintiffs complain that I forced them to accept an unwanted stipulation about damages. What actually happened is that the defendant conceded damages before trial and I therefore ruled that damages could not be tried. Specifically, the defendant insurer conceded that if the plaintiffs established liability, it would pay the policy limits regardless of comparative negligence.[3] That was not a stipulation

---

1. His statement to the police was admitted into evidence by the defendant as Exhibit 17B.

2. Ms. Gurney did not testify at trial. Her statement to the police, given at the scene of the accident, was admitted into evidence by the plaintiffs as Exhibit 31.

3. Under Nevada law, establishment of liability required a jury determination that Susan Ford was 50% or less responsible. Nev.Rev. Stat. § 41.141 (2001). If so, the defendant insurer would pay the policy limits.

that required agreement; it was an outright concession.[4] Federal courts resolve only disputed cases or controversies. Here, the only dispute was liability, and that issue was tried. Nevertheless, the plaintiffs wanted to have the jury hear how badly Susan Ford was injured in the collision. The defendant, concerned that jury sympathy for a badly injured plaintiff might unfairly affect the jury's assessment of liability, wanted to keep this information to a minimum. The remaining question for me, then, was an Evidence Rule 403 issue: the probative value of Susan Ford's injuries on the issue of liability, balanced against the danger of unfair prejudice.[5]

The plaintiffs made three major arguments as to why the severity of the injuries was probative on liability.

### A. Susan Ford's Memory of the Accident

The plaintiffs argued that they needed to try Susan Ford's injuries to the jury to demonstrate that there was a reason she lacked memory of the accident. The defendant then agreed to stipulate that because of the medical consequences of the accident Susan Ford had no memory of the collision. I so instructed the jury.

### B. The Cab Driver's Statement to Police

The plaintiffs also argued that they needed to try the injuries to the jury to explain why the cab driver neglected to tell the police at the scene the seemingly critical piece of information that the other driver had been driving with his headlights off in the pre-dawn darkness. (At the scene, the cab driver told the police that he saw the accident in his rearview door mirror and that Lawrence's truck was traveling east on Tropicana when it hit Susan Ford's vehicle; he did not reveal this "lights off" information until 19 months after the event at a deposition.) The plaintiffs wanted to argue that his failure to mention it resulted from his being severely distracted by the life-threatening injuries to Susan Ford and her sister, and his concern for their lives. I reserved for trial "whether the severity of the injuries has any bearing upon the testimony of the ... taxi driver" and instructed the lawyers to approach side-bar when the issue was ripe. Order of May 8, 2002.[6]

In fact, before the trial was over the jury was well aware that this was a very serious accident. They heard Susan Ford's sister, Paula Koveleski, testify that she turned to look after she heard a "big crash," Koveleski Test. at 12, that she was in hysterics at the accident scene, id. at 25, and that she thought her sisters were dying. Id. at 26. David Moody, one of the police officers who investigated the accident, testified (by deposition) that there was extensive damage on the left side of Susan Ford's vehicle, Dep. of David Moody at 12, and that the accident involved injuries. Id. at 45. Kevin Lawrence agreed

---

4. The plaintiffs recognize as much in their reply brief: "The Fords objected to a Stipulation that guaranteed them the maximum recovery allowable by their policy, even though they fully appreciated the substantial risk that she would be found comparatively negligent, which she was." Reply Br. at 2.

5. The plaintiffs would have been in the same position on their liability case if I had bifurcated liability from damages, a not uncommon measure in serious injury cases. I earlier declined to bifurcate because I thought the issues for trial were too simple and the trial too short to justify bifurcation. That appears to have prompted the defendant insurer's concession on damages.

6. Because much of this testimony ultimately came in by way of deposition, the argument was actually pursued in objections to transcript designations.

that it was "a pretty serious accident," Dep. of Kevin Lawrence at 55, and testified that both of his air bags deployed in the collision and that he had to kick his door open before he could exit his truck. *Id.* at 48. He also testified that Susan Ford and Shirley Pole were injured, *id.* at 56, and that they "were being attended to by emergency personnel." *Id.* at 54. In addition, the jury heard the stipulation that, because of her injuries, Susan Ford was unable to recall the accident.

Furthermore, the jury was not forced to rely solely on this evidence when assessing the cab driver's testimony. The cab driver, himself, testified about the severity of the accident and its effect on his mental state. They heard him testify (by deposition) that he thought the "girls could have been killed," Reekie Dep. at 53, that his passenger, Paula Koveleski, was "hysterical," *id.* at 63, 95, and that he was upset, *id.* at 97, and nervous. *Id.* at 85. Several times he testified either that he did not recall certain details or that he did not report them to police because he was "more concerned about the girls," *id.* at 59, "shook up," *id.* at 95, or because of "the pressure [he] was under." *Id.* at 108.

Thus, the jury heard enough evidence for the plaintiffs' lawyer to pursue his theory of why the cab driver earlier failed to tell the police that Kevin Lawrence's headlights were off. The jury simply did not find it persuasive. (The plaintiffs' lawyer himself challenged the cab driver's credibility on another part of the evidence, namely, how he made the change of direction on Tropicana.)

## C. Allocation of Damages

The plaintiffs also argued that they needed to try the injuries to the jury so that the jury could allocate the insurance benefits between Susan Ford's injury claim and Dennis Ford's loss of consortium claim. I ruled that if this truly was a dispute (the plaintiffs had only one law firm representing them both), it was a dispute between the plaintiffs, and that, if necessary, it could be tried later to a jury, but that it was none of the defendant's concern and did not create a case or controversy between the insurance company and the plaintiffs.

There was no abuse of discretion in these rulings under Evidence Rule 403 or any other legal principle.[7] What the plaintiffs really wanted to do was impress upon the jury "the difficulty with which the emergency personnel extracted [Susan Ford and her sister] from the vehicle" and the "carnage" at the scene. Pls.'s Reply Br. at 2–3. Because this was a liability-only case, it was appropriate to limit the amount of that kind of sympathy-inducing testimony under Rule 403.

### DEFENDANT'S EXPERT

The plaintiffs argue that I should never have permitted the defendant's expert, John Meserve, to testify on the subject of accident reconstruction because of Evidence Rule 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). I believe the record supports my decision as gatekeeper under *Daubert, Kumho Tire*, and Evidence Rule 702 to let

---

**7.** The plaintiffs cite to *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), but that case supports what I did here. There, the Supreme Court held that when a defendant being prosecuted as a felon in possession of a weapon concedes that he is a felon, under Evidence Rule 403 the prosecutor can no longer introduce evidence of the nature of the felony.

the jury hear his testimony and to let the jury decide what weight to give it. No more need be said.

### FLAG LAPEL PIN

At the beginning of the last day of trial, as the defendant was about to call its expert to the stand, the plaintiffs' lawyer asked me (out of the jury's presence) to order the witness to remove an American flag pin he was wearing in his lapel. The plaintiffs' lawyer argued that such pins are more commonly worn by Republicans than Democrats; that the witness was, in fact, an active Republican (albeit in New Hampshire rather than Maine); and, thus, that the witness's wearing of the pin might improperly influence some jurors by identifying the witness's partisan political views. I took judicial notice of the fact that, since September 11, 2001, many Americans, regardless of party, wear such pins, and declined to order the witness to remove it. In their motion for new trial, the plaintiffs make a somewhat broader argument. The plaintiffs now argue that

their ability to aggressively cross-examine the witness was prejudiced because he was allowed to "drape himself in the American flag, thereby cloaking his testimony with patriotism and inviting the jury's emotional instinct." Whether the plaintiffs' argument is based on the pin's purportedly partisan identity or a more generalized nationalistic or patriotic meaning, there is no basis for a new trial.

The First Circuit has said that "it is beyond serious question" that a trial judge, who is "charged with the responsibility of maintaining proper order and decorum" in the courtroom has "the right (and, indeed, the duty) to limit, to the extent practicable, the appearance of favoritism in judicial proceedings, and particularly, the appearance of political partiality." *Berner v. Delahanty,* 129 F.3d 20, 26 (1st Cir.1997). When exercising that power, the court must balance the First Amendment rights of the person wearing the challenged article against the risk of disruption, distraction, or the "specter of politicization and partiality." [8] *Id.* at 27. The *Berner* court

8. Courts in other jurisdictions have used similar balancing tests when faced with challenges to the attire of a witness, *see, e.g., Morales v. Artuz,* 281 F.3d 55, 62 (2d Cir. 2002) (denying habeas corpus petition where trial court allowed prosecution witness to wear sunglasses while testifying); *State v. Page,* 135 Idaho 214, 16 P.3d 890, 896 (2000) (no abuse of discretion where trial court allowed police officer witnesses to testify while wearing firearm); *State v. Allen,* 113 Or.App. 306, 832 P.2d 1248, 1249–50 (1992) (trial court abused its discretion by excluding witness who refused to remove Muslim religious headgear; applicable local rule required witnesses to "be dressed so as not to detract from the dignity of the court"); of a defendant, *see, e.g., Ryslik v. Krass,* 279 N.J.Super. 293, 652 A.2d 767, 772 (App.Div.1995) (trial court abused its discretion by ordering new trial because defendant catholic priest testified while wearing clerical attire); *Edwards v. Ellis,* 478 So.2d 282, 286 (Miss.1985) (reversal not warranted when defendant highway

patrolman allowed to wear uniform when sued for conduct unrelated to official duties); *Wirsing v. Krzeminski,* 61 Wis.2d 513, 213 N.W.2d 37, 44 (1973) (no error where trial court allowed defendant police officer to testify wearing uniform with American flag patch); or of an attorney. *See, e.g., LaRocca v. Gold,* 662 F.2d 144, 149 (2d Cir.1981) (no error where trial court required attorney who was also catholic priest to remove clerical collar); *Montgomery v. Muller,* 176 A.D.2d 29, 580 N.Y.S.2d 110, 112 (N.Y.App.Div.1992) (no error where trial court required prosecutor to remove American flag lapel pin).

I have found only one case in all of the reported state and federal cases where an appellate court held that a trial court erred by declining to tell a witness what to wear or what not to wear. *State v. Allen,* 800 So.2d 378, 390 (La.Ct.App.2001) (error to allow witness to testify in murder trial while wearing "T-shirt emblazoned with a photograph of the victim").

considered the following factors; whether the challenged article has a primarily political purpose; the role of the wearer in the courtroom (*e.g.*, lawyer or witness); and whether the rule or ruling prohibiting the article is viewpoint neutral.[9]

■ With these considerations in mind, I turn to the American flag lapel pin worn by the defendant's expert. To my observation, there was nothing unusual about the pin's size or nature. I am not sure how well the jury could see it, but I will assume that at least the closest juror could see it and inform the rest of the jury. Because the pin was worn by a witness, not an officer of the court, there was little risk that it would "compromise the environment of impartiality and fairness" in the courtroom. *Berner*, 129 F.3d at 27. Additionally, unlike the pin at issue in *Berner*, a two-inch pin urging a particular vote on a pending referendum issue, this was not a political pin that took a position on an issue of current controversy. As I

observed at the time, these flag lapel pins have swept the country since September 11; whatever their status was before September 11, they no longer make a person stand out or provoke political dissension. In today's world, they are more common than neckties or scarves.[10] The ruling was viewpoint neutral. There was no abuse of discretion.[11]

## CONCLUSION

This case was fairly tried. The issue was liability, not damages. It was undisputed that Susan Ford, parked eastbound on the side of Tropicana, pulled out from the side of the road and was crossing its eastbound traffic lanes at a right angle, not at an intersection, when she was hit broadside by a vehicle in the proper lane of traffic on Tropicana. The jury was clearly entitled to find this maneuver negligent. By definition the other driver was also negligent, under Nevada law, because his

---

**9.** The plaintiff in *Berner* argued that the trial court's ban was not viewpoint neutral, because the judge "routinely permitted the wearing in his courtroom of other ornamentation supporting causes, such as crucifixes and insignia for armed forces or fraternal orders," 129 F.3d at 22. But the First Circuit rejected this argument:

> No substantial equivalency exists between political buttons, on the one hand, and military and religious emblems, on the second hand. A political button has only a single purpose: to express a view on a political candidate or cause. In contrast, military and religious symbols, standing alone, do not expressly advocate a particular political position, and, at best, are subject only to secondary political connotations. Such adornments have multiple meanings, including but not limited to conveying allegiance to a particular institution or a broad band of convictions, values, and beliefs.

129 F.3d at 29. The latter category seems very close to a flag lapel pin.

**10.** If trial judges must censor non-political lapel pins on witnesses, where is the line to be

drawn? In a previous generation, tie clips often carried insignia of one sort or another, and one still sees an occasional man with such a tie clip. Wedding rings or school rings, less explicit but nonetheless potentially potent symbols, are commonly worn by witnesses. What about a religious pin such as a crucifix? Are yarmulkahs or turbans to be forbidden? What of ethnic dress? Hair length and style may convey important religious, cultural, or political meanings. Arguably even the decision to wear a suit makes a statement (the noun now describes not just an article of attire, but a category of person such as banker and lawyer: "the suits"). All these choices make a statement analogous to any statement made by wearing a flag lapel pin.

**11.** In reaching this conclusion, I have assumed (without deciding) that in the exercise of my discretion as a trial judge I could have ordered a witness to remove a pin of this sort in these circumstances. The *Berner* court explicitly noted that it is an open question whether, and under what circumstances, a judge may order the removal of non-political insignia. 129 F.2d at 29 n. 7.

blood alcohol content was over the legal limit. The issue was whose negligence primarily caused the collision. Whether the other driver's headlights were illuminated was a critical issue. If they were not illuminated, there was an explanation (other than Susan Ford's negligence) as to why she pulled out in front of him. If they were illuminated, it would be hard to excuse her maneuver. Over objection I permitted Susan Ford to introduce the recent testimony by the cab driver that the other driver's lights were off at the time of the collision. But the jury also learned that no one mentioned this important piece of information at the accident scene, neither the cab driver (who saw the collision in his rearview mirror), nor another driver who was proceeding in the opposite direction. Expert testimony on both sides was properly admitted, and both experts were tested on cross-examination. Although it is unusual for a drunk driver to escape liability, there was abundant evidence here for the jury to conclude that once Susan Ford started to pull out onto Tropicana to reverse direction, this accident was destined to happen whether Kevin Lawrence was sober or drunk; one witness's flag lapel pin did not make the difference.

The motion for new trial is DENIED.

SO ORDERED.